NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CABLE VISION, INC., Respondent.

No. 80–1611.

United States Court of Appeals,
First Circuit.

Argued April 8, 1981.

Decided Sept. 18, 1981.

**2**

Howard E. Perlstein, Atty., Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and R. Michael Smith, Atty., Washington, D. C., were on brief, for petitioner.

Julius Kirle, Chestnut Hills, Mass., for respondent.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

This case grows out of a labor dispute between Cable Vision, Inc., a subsidiary of AR Telecommunications, Inc., which sells and installs cable television service in Lewiston, Maine, (the "Company") and Local 2327, International Brotherhood of Electrical Workers, AFL–CIO (the "Union"). On January 17, 1977, the NLRB certified the Union as the exclusive bargaining representative of the Company's seven technicians and installers and its one part-time

worker. Between February 23, 1977 and April 27, 1978, the Union and the Company held twenty-two collective bargaining sessions. The Union went on strike against the Company from May 1 until June 23, 1978. They did not reach agreement.

The NLRB found that the Company committed several unfair labor practices during this time: it did not bargain in good faith; various of its supervisors in conversations with employees coerced them in the exercise of their organizational rights; and the Company effectively discharged one of its employees because he engaged in union activity. The Board has applied for enforcement of a remedial order [1] based upon these findings.

■ We have reviewed the record in accordance with the mandate of *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We uphold findings of fact if supported by substantial evidence on the record as a whole. (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 477, 71 S.Ct. at 459, *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). We sustain the inferences that the Board draws from those facts and its application of statutory standards to those facts or inferences as long as they are reasonable. *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1073 (1st Cir. 1981). And we will not substitute our judgment for that of the Board when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 464, 95 L.Ed. 456. Our review of the record in light of these stan-

dards convinces us that the Board's findings are adequately supported and we grant enforcement of the Board's order.

## I.

■ The Board found that the Company violated section 8(d) of the National Labor Relations Act (the Act) by failing to bargain with the Union in good faith.[2] Rather, in its view, the Company engaged in mere "surface bargaining", or "shadow boxing to a draw", or "giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining". *Quoting NLRB v. Herman Sausage Co.*, 275 F.2d 229, 232 (5th Cir. 1960). We have noted that in such a case,

> [t]he question is whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiations as an elaborate pretense with no sincere desire to reach an agreement if possible, or that it bargained in good faith but was unable to arrive at an acceptable agreement with the union.

*NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). The record supports the Board's negative answer to the question.

First, the Administrative Law Judge found, and the Board concurred, that the bargaining between the parties was marked by a series of delays caused primarily by the Company. The record supports this conclusion. Indeed, these factors alone go far towards supporting a finding of an unfair labor practice. Only twenty-two bargaining sessions were held over a period of fourteen months—with an average of two weeks and as much as a month passing

---

1. The Board's Decision and Order is reported at 249 N.L.R.B. 412 (1980).

2. Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." Section 8(d), 29 U.S.C. § 158(d), states that:

> to bargain collectively is the performance of the mutual obligation ... to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement.
>
> At the same time, however, this "obligation does not compel either party to agree to a proposal or require the making of a concession ...." *Id.*

between each session. The parties averaged only 4½ hours per month at the bargaining table. While this schedule would not be a matter of concern if both parties were pleased with it, such was not the case here. Rather, the Company repeatedly ignored requests by the Union that both the frequency and length of the bargaining sessions be increased and rejected a Union request to accept counter-proposals by mail to expedite the bargaining. Additionally, the record shows that only four of the twenty-two sessions began on time—and most of the delays appear to be attributable to the Company.

Foot-dragging characterized the bargaining process. The Company failed to provide a single written proposal of its own until the fifth session, 3½ months after receiving the Union's proposed agreement. The Company's first proposals on discharge and travel expenses appeared six months into the bargaining. In addition, the Company did not complete data on its health, pension and welfare plan until some three months after the Union's initial request for the information.

At the bargaining sessions, the Company tended neither to accept, reject, nor offer modifications of Union proposals. Instead, it would promise to "study" and "consider" the Union's suggestions, a promise the Company was still freely giving after nearly a year of negotiations during which its own proposals had been submitted and resubmitted with little, if any, change. While an attitude of openmindedness is a hallmark of good faith bargaining and should be encouraged by both the Board and the courts, the mere statement that a party will "study" and "consider" proposals, repeated *ad infinitum* and combined with other evidence of deliberate delay, gives the impression of a party which is attempting to avoid rather than to induce agreement.

Second, the Company's positions on the substantive issues debated at the bargain-ing table suggest a lack of good faith. The parties debated sixteen major subjects.[3] In thirteen of the areas, it was possible to determine what the Company's practice was prior to unionization. In ten of those thirteen, the Company sought an agreement less favorable to its employees than its *current* practice. It offered less than "current practice" in relation to wage increases, unpaid personal time, standby work on a holiday, tower work, out-of-town expenses, the pension plan, holiday pay for work before and after a holiday, subcontracting, work week schedule, and vacation periods.

During the next twenty-two months of bargaining, each side made proposals and counterproposals. The record suggests that the Union made important concessions in fourteen areas, while the Company's concessions seem minor. In the area of "seniority", for example, the Union initially sought seniority within job classification, two weeks notice and severance pay if there was a lay-off, laying off by seniority with part-time employees and subcontractors going first, recall rights for two years, and a two-week period for a recalled employee to return to work. The Company proposed a lay-off principle that would allow it to keep part-time employees and subcontractors while laying off bargaining-unit members according to length of service and according to "ability and skill to perform in the judgment of the Employer"; it proposed recall rights for three months, and permitted three work days for a recalled employee to return to work. The Union later modified its proposals to allow the employer to use skill and ability in considering whom to lay off; it withdrew its requests for notice and severance pay; and it reduced its demand for recall rights to six months with a ten day period for the recalled employee to return to work. The Company met these modifications by offering to increase its proposed "three work day" return period for a recalled employee to five days. It made no further offer.

---

**3.** The sixteen priority subjects were wages/promotion; seniority-layoff; work week; overtime; grievance and arbitration; call out; standby; paid/unpaid absences; tower work; subcontracting; vacations; holidays; expenses; uniforms; pension, health and welfare; and management rights.

In most key areas the Company remained immovable. With the exception of "grievance procedure", it did not accept any change during the negotiations that would have made the employees better off in any significant respect than the firm's "current practice". It did not change its position on wages or insurance. (Indeed, the Company would not offer to give its employees the annual wage increase that was its current practice, despite significant union modifications of its initial wage request.) It made no counterproposal on the issue of "uniforms". It remained firm as to the essential aspects of its position on a pension plan, call-outs, and sick leave. It insisted upon an extensive management rights clause, which would have significantly curtailed the Union's general powers, and it also insisted upon specific individual restrictions upon such Union activities as grievance arbitration. In sum, the record suggests little meaningful response by the Company to the Union's offers and counteroffers—to the point where, after twenty-two months of bargaining, the parties reached agreement on only one subject: tower work.

While "[a]damant insistence on a bargaining position . . . is not in itself a refusal to bargain in good faith", *Chevron Oil Co., Standard Oil Co. of Tex. Div. v. NLRB*, 442 F.2d 1067, 1072 (5th Cir. 1971), and use of a company's relative economic strength to exert pressure on a union "is of itself not at all inconsistent with the duty of bargaining in good faith", *NLRB v. Insurance Agents' Union*, 361 U.S. 477, 490–91, 80 S.Ct. 419, 427–28, 4 L.Ed.2d 454 (1960), the failure to come close to agreement accompanied by a failure to make meaningful concessions on nearly every subject suggests that something is awry. One major function of collective bargaining is to allow the parties—union and management—*separately* to order their priorities and then to meet and trade off what is less important for what is more important to each side individually. D. Bok and J. Dunlop, *Labor and the American Community* 225 (1970).

Thus, one would ordinarily expect meaningful trading and movement—even within the confines of a fixed management budget—particularly when as many as sixteen different complex subject matters are on the table. When no such movement occurs, one wonders why. And, if management has adhered uniformly to proposals predictably unacceptable to the Union, has refused to make meaningful concessions in nearly every area, and has insisted (without clear justification in principle) on maintaining its original positions in these areas (and the Union has not), one has some evidence for concluding that the Company has engaged in surface bargaining instead of bargaining in good faith.

These Board findings on both procedural and substantive matters are supported in the record. They justify a Board finding of failure to bargain in good faith. The circumstances present here are sufficiently close to those at issue in *Reed & Prince*, 205 F.2d at 131 (employer's delay of initial bargaining session, refusal to allow union to post routine notices to members, unjustified delay in providing requested information, adamant refusal to consider key terms without a principled reason, and presenting a seriously deficient and one-sided "proposed contract") as to warrant a similar result. *See K-Mart Corp. v. NLRB*, 626 F.2d 704, 706–07 (9th Cir. 1980). *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 608–10 (7th Cir. 1979). *See also Alba-Waldensian, Inc.*, 167 N.L.R.B. 695 (1967).

## II.

The Board also found that several conversations between two company supervisors, Walter Radvon and Ronald Hammaker, and various employees interfered with, restrained, or coerced the employees in the exercise of their rights to organize, join unions, bargain collectively, and strike, in violation of the Act, Section 8(a)(1).[4] In determining the likely effect of these conversations, the Board correctly examined

---

4. Section 8(a)(1), 29 U.S.C. § 158(a)(1), makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees" in the exercise of their section 7 rights to organize and to engage in protected concerted activities.

the employer's remarks "from the listener's point of view", *Hendrix Mfg. Co. v. NLRB,* 321 F.2d 100, 105 (5th Cir. 1963), taking into account "the economic dependence of the employees on their employers" and "the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). We believe the conversations were such as to justify a Board finding of violation.

One conversation took place in Cable Vision's office about a year after the Union's certification. Radvon, a supervisor working for Montachusetts Cable, another of AR Telecommunication's subsidiaries, spoke to Richard Vallee, a Cable Vision employee. Radvon told Vallee that Cable Vision's employees were unhappy but Montachusetts' employees had no union and were happy. He stated that if Cable Vision's employees dropped the Union there would be changes. He added that he had once been a member of a union, which had wanted only money and was no good. In response to Vallee's question about what specific changes he might expect if the union were dropped, Radvon replied that he could make no specific promises or say that there would be a raise. The ALJ found that, in context, Vallee might reasonably have believed Radvon to promise impliedly that working conditions would improve if the Union were dropped. His refusal to give a *specific* promise did not demonstrate the absence of an implied, general promise. While Radvon did not work for Cable Vision, he was a supervisor at another AR Telecommunications subsidiary; hence his views expressed in a conversation were bound to carry weight. The degree of weight and the likely interpretation to be given to Radvon's statements depends upon context, and an ALJ is likely to understand that context better than is a reviewing court. Though

the issue is a close one, given the deference due the Board on this type of question, a majority of the court[5] upholds its finding that Radvon gave an implied, general promise to remedy employee grievances or provide other employee benefits if the Union was abandoned, in violation of section 8(a)(1). *NLRB v. Pilgrim Foods, Inc.,* 591 F.2d 110, 114–17 (1st Cir. 1979).

Another conversation took place in early 1978 when Hammaker, the Company's Director of Operations, rode with employee Lucien Mailhot on his service route. Mailhot apparently brought up the subject of union negotiations. After avoiding the subject for a while, Hammaker asked Mailhot why he had voted for the Union. In response to Mailhot's complaints about management, Hammaker said that management had been changed and that matters would have improved, but now that there was a union "it was going to take some time". Hammaker asked for other comments. Mailhot complained about the firm's policy concerning uniforms. Hammaker noted that there was a new manager, but that Mailhot's complaint about the Company's charge for uniforms would have to be negotiated through the Union. Mailhot asked about his annual raise; Hammaker responded that he would probably not get it "because things had to remain status quo because of the Union."[6] Hammaker asked what the employees wanted and what they hoped to achieve through the Union. Mailhot said that the employees would not give up. Hammaker assured Mailhot that the Company would not penalize him if he dropped the Union. And, with Mailhot reiterating his support for the Union, the conversation ended.

Again, the issue is a close one. But, on balance, we believe that the ALJ, primarily responsible for judgments as to credibility, *see NLRB v. Pearl Bookbinding Co., Inc.,* 517 F.2d 1108, 1112 (1st Cir. 1975), could

---

5. Judge Campbell believes that there is not substantial evidence to support the Board's finding in this regard, and would reverse on this particular matter.

6. Hammaker testified at the hearing before the ALJ that the employees received merit raises each year, "give or take three months."

reasonably conclude that this conversation contained elements of restraint, interference or coercion, in that Hammaker drew Mailhot out about his grievances and implied that they might be resolved were there no union, *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d at 114–15. Hammaker impliedly (and wrongly) blamed the Union for a decision to withhold a wage increase, *NLRB v. Otis Hospital*, 545 F.2d 252, 255–56 (1st Cir. 1976).[7] And, Hammaker delved into the strength of Mailhot's union sympathies, *id.* at 256–57; *NLRB v. Sandy's Stores, Inc.*, 398 F.2d 268, 270 (1st Cir. 1968).

Finally, employee Ralph Caron testified that Hammaker and Vallee met him on the job in January 1978. When Caron complained about the lack of a raise, Hammaker said that he could do nothing about it because "there would be outside influences." In response to a question by Caron about his uniform, Hammaker noted that his men at Montachusetts did not pay for their uniforms but Cable Vision's employees did pay. The ALJ, reasonably crediting Caron's assertions over Hammaker's denials, *see NLRB v. Pearl Bookbinding Co., Inc.*, 517 F.2d at 1112, found that these responses constituted a wrongful effort to blame the Union for the employer's decision to withhold the wage increase, *NLRB v. Otis Hospital*, 545 F.2d at 255–56, and an implied promise that a grievance might be resolved were the Union given up, *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d at 114–15. In sum, we believe in the case of each of these conversations that the ALJ's findings and the Board's decision to adopt those findings were within the confines of the statute and adequately supported in the record.

The most questionable of the Board's determinations is its finding that the Company violated sections 8(a)(1) and 8(a)(3)[8] of the Act when it assigned installer Donald Jandreau to standby duty. During his years with the Company Jandreau worked during his off-hours as a musician at various night clubs, mostly on weekends and an occasional week-night, with each engagement lasting for three or four hours. He also attended rehearsals about twice a week for three to four hours. Jandreau testified that during some months, his income from his musical work exceeded his earnings at the Company. His musical activities were reported in the Company's November-December 1977 newsletter, and Company Supervisor Jim Palmer attended some of his performances. Jandreau refused to accept the standby duty, requiring night and weekend availability, and resigned from the Company. This, in the Board's view, amounted to his "constructive" discharge by the Company and discriminated against him on account of his union activity.

■■ In a dual motive case such as this one, the initial inquiry is whether the Board has made a *prima facie* showing that a "significant improper motivation" underlay the Company's action. *Statler Indus., Inc. v. NLRB*, 644 F.2d 902, 905 (1st Cir. 1981); *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979). Such a showing can rest either on independent evidence of antiunion animus or on the circumstances surrounding the conduct itself. *Id.* at 670. Here we find both sorts of evidence.

First, there is evidence that, prior to Jandreau's assignment, the Company did not assign employees with his limited technical abilities to standby work. The Company installs and maintains cable television systems. It stands ready to respond to emergency calls from its customers. Such calls may reflect a problem with a television set in a customer's home, with the wires connecting that set to the outside trunk lines,

---

7. *See generally NLRB v. Patent Trader, Inc.*, 415 F.2d 190, 199 (2d Cir. 1969) (where wage "increases were given pursuant to normal Company policy", failure to grant the usual increases during negotiations may be held to constitute "punitive action" by the Company against those engaging in union activities.)

8. Section 8(a)(3), 29 U.S.C. § 158(a)(3), provides in relevant part that "[i]t shall be an unfair labor practice for an employer by discrimination in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization."

or with parts of the cable television "system" in the area outside the home. But, since the Company usually dispatched standby workers to the field only after three service calls from an area were received, usually, or at least often, emergency work involved a "system" problem. Those who, like Jandreau, were primarily installers could deal with fairly simple problems related to fine-tuning the television set, to its installation, and to the home/trunk wire connections. But, they were not able to deal with most "system" problems. Rather, "system" problems were ordinarily dealt with by technicians, who could service system amplifiers, transformers, relays, main trunk lines, and deal with more complex electronic problems. Thus, it is not surprising that the Company's standby roster originally contained the names of technicians and those installers who had received technician-type training, but not Jandreau.

Second, there is evidence that Hammaker, who assigned Jandreau to standby duty, knew that Jandreau held a job as a part-time musician, that standby duty and musical duty would prove incompatible, and that Jandreau was, therefore, likely to quit. Indeed, Jandreau told Hammaker that Hammaker's predecessor had promised him when he was hired that he would not have to work standby as an installer.

Third, Jandreau was an important figure in the Union. He was chief union steward, the leading organizational activist, the employee representative at contract negotiating sessions, and the most active employee on the picket line.

Fourth, Hammaker assigned Jandreau to standby duty on June 26, 1978, three days after the strike ended. He also incorrectly implied to Jandreau that he was without power to change Jandreau's assignment.

Fifth, the Company's activities during the negotiation sessions and its practices described earlier in this opinion provide some evidence of an antiunion animus.

We think these factors suffice to establish a "significant improper motivation" for the standby duty assignment.

The burden therefore shifts to the Company to "prove that it had a good reason, sufficient in itself, to produce" the assignment. *Statler Indus., Inc. v. NLRB*, 644 F.2d at 905, *quoting NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 671. This shift does not impose an overall burden upon the Company of proving itself "innocent" of violating the statute. Rather, it must simply come forward with enough evidence to convince the trier of fact that, under the circumstances, there is no longer a preponderance of evidence establishing a violation. *NLRB v. Amber Delivery Service, Inc.*, 651 F.2d 57, 69 (1st Cir. 1981). We believe the ALJ—the trier of fact—could reasonably conclude that the Company here failed to do so.

In its efforts to show that it would have assigned Jandreau to standby duty anyway—regardless of any "antiunion motive" —the Company produced evidence that two "installers" had been placed on the standby roster even before the strike, that Jandreau was able to carry out many technical repairs, that technological developments had made "emergency" repairs easier to carry out, that the Company placed eight other installers (hired during the strike) on the standby roster after they had been employed for eight weeks, and that Jandreau was able to "trade" his standby duties with other employees.

The ALJ found this evidence insufficient to overcome the *prima facie* case for several reasons. First, the two employees previously on the standby roster, while called "installers", had significantly more technical training than Jandreau and were effectively "technicians". Second, the technological developments took place in late 1977 (or January 1978 at latest); no change in the nature of the emergency work had taken place since that time; yet the Company did not put installers on standby duty until it approached Jandreau in June. Third, while Jandreau was able to perform many repairs, he had significantly less ability to make "system" repairs than all others who

had previously been placed on standby duty. Fourth, (despite the strong support that the assignment of eight other installers to standby duty apparently offers the Company's argument) the eight "strike replacement" workers were not placed on the standby roster until well after Jandreau was placed there (thus calling into question the value of their assignment as objective evidence). The record is silent as to the extent of their technical training. And, during the strike itself, when the Company may have been hard pressed for personnel to perform emergency work, it did not assign installers to standby duty, but, rather, relied upon one technician to perform emergency work.[9]

The record provides evidence in support of the claims and findings by both the Company and the ALJ. After reviewing it, we would state our conclusion on this issue with caution: although we might not have decided this issue as did the Board were we viewing the matter *de novo*, we cannot say that there was no substantial evidence supporting the ALJ's, and subsequently the Board's, finding that the evidence of "significant improper motivation" outweighed the evidence of proper motive produced by the Company. Therefore, we accept the Board's finding of an unfair labor practice.

*For these reasons, we grant enforcement of the Board's order.*

9. The Company argues that during the bargaining the Union agreed, with no objection from Jandreau, to permit all "qualified" employees to perform standby. But that fact does not show that Jandreau expected to be called to standby because, presumably he did not think of himself as "qualified" to do such work.