**In re CONTINENTAL AIRLINES CORP., Continental Air Lines, Inc., Texas International Airlines, Inc., TXIA Holdings Corp., Debtors.**

Bankruptcy Nos. 83–04019–H–2–5, 83–04020–H–1–5, 83–04021–H–3–5, 83–04022–H–3–5 and 83–4019–H–2–5.

United States Bankruptcy Court, S.D. Texas, Houston Division.

Oct. 1, 1985.

John J. Gallagher, Charles L. Warren, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for plaintiff.

Claude Montgomery, Booth, Marcus & Pierce, New York City, for Official Union Labor and Pension Creditors' Committee.

Harvey R. Miller, Bruce R. Zirinsky, Weil, Gotshal & Manges, New York City, Lenard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., for Continental, et al.

Jay D. Roth, Larry C. Drapkin, Christopher D. Cameron, Taylor, Roth & Bush, Los Angeles, Cal., for Union of Flight Attendants Local No. 1.

Bruce Simon, Michael E. Abram, Ann E. O'Shea, Cohen, Weiss & Simon, New York City, Bruce Fickman, Helen Brattin, Schwartz, Waterman, Fickman & Van Os, Houston, Tex., Air Line Pilots Ass'n, Intern.

## FINDINGS OF UNCONTESTED FACT AND CONCLUSIONS OF LAW WITH RESPECT TO UNION CLAIMS FOR WRONGFUL DISCHARGE

T. GLOVER ROBERTS, Bankruptcy Judge.

### FINDINGS OF UNCONTESTED FACT

1. The docket in this case reflects that, as cited below, on September 24, 1983, Continental Air Lines, Inc. and Texas International Airlines, Inc. filed petitions for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101, et seq. Upon filing the bankruptcy petition, Continental temporarily suspended all domestic service and on September 27, 1983, Continental began rebuilding that service by reinstating a limited portion of its domestic service, initially requiring fewer employees than immediately prior to bankruptcy. The active employees worked under "emergency work rules" and were generally paid lower wages and benefits than they had received before the filing of the petition.

2. Subsequent to Continental's implementation of the emergency work rules, the Air Line Pilots Association, International ("ALPA") and the Union of Flight Attendants ("UFA") called strikes which began October 1, 1983. The ALPA strike has continued to the present. The UFA strike was terminated on April 17, 1985, when the union instructed its members to offer unconditionally to return to work.

3. Continental filed a Motion To Reject its collective bargaining agreements with ALPA and UFA on September 27, 1983. Following an extended hearing, this Court approved Continental's motion to reject its collective bargaining agreements with ALPA (Order of June 19, 1984) and UFA (Order of December 5, 1984). Each contract rejection is retroactive to September 24, 1983.

4. This Court has previously found that "had Continental not made its unilateral changes in pilot pay and work rules, it would have been unable to continue its operations for very much longer for want of necessary cash and, because it could not compete effectively with the low cost carriers in direct competition with it, it would have continued losing money until it closed its doors." Findings of Fact and Conclusions of Law Relating To The Rejection Of The Collective Bargaining Agreement With ALPA para. 28; see In re Continental Airlines Corp., 38 B.R. 67, 71–72 (Bankr.S. D.Tex.1984); Memorandum Of Authorities Authorizing Rejection of ALPA Collective Bargaining Agreement at 12–13, 30. The Court also found that "without substantial concessions from [the UFA] contracts Continental would run out of money and go out of business." Findings of Fact And Conclusions of Law Relating To the Rejection of Collective Bargaining Agreements with UFA at 8.

5. This Court has further found that the emergency work rules applicable to pilots and flight attendants were modeled on work rules in use at Braniff Airways, Inc., and that a substantial proportion of the unionized employees at Continental have indicated, by electing to cross the picket lines, "their willingness to work at the wage levels and under the working conditions (including increased productivity) offered by Continental." Memorandum Of Authorities Authorizing Rejection of ALPA Collective Bargaining Agreements at 47–

48; *see* Findings of Fact And Conclusions of Law Relating To The Rejection Of The Collective Bargaining Agreement With ALPA at para. 31, 32; Findings Of Fact And Conclusions Of Law Relating To The Rejection Of Collective Bargaining Agreements With UFA at 6–7, 10.

6. *This Court's previous findings make clear that the striking pilots retained their status as employees during the time they were on strike. See* Memorandum of Authorities Authorizing Rejection Of ALPA Collective Bargaining Agreement at 22, 23–24. (emphasis supplied) This Court has also found that upon filing its petitions for reorganization, "Continental immediately went on a campaign to get the remaining pilots to agree to fly under the emergency work rules," and that once ALPA's October 1, 1983 strike began, "Continental maintained a telephone 'bank' in which pilots were called and requested to fly." Memorandum Of Authorities Authorizing Rejection Of ALPA Collective Bargaining Agreements at 22. This Court has further found that Continental "made a strenuous effort to get striking pilots to return to service," and upon "instructions from its chief operating officer, Continental delayed hiring [replacements] pilots until it felt it had to do so to service its re-expanding route system." *Id.* at 22–33.

7. ALPA and UFA have filed numerous claims in this Court, the claim at issue here [1] asserting that the changes in wage rates and work rules on September 24, 1983 constituted wrongful constructive discharges of the affected employees, and have claimed damages for such alleged wrongful constructive discharges on behalf of all pre-petition pilots and flight attendants, respectively. On this issue, Continental has sought summary judgment disallowing the wrongful discharge damage claims on the grounds that such claims are preempted by federal labor law remedies; and argues that, in any event, the elements necessary to support a claim of wrongful constructive discharge are not present. In addition, Continental has also sought, pursuant to 11 U.S.C. § 502(c), to have the wrongful discharge claims estimated to have zero value. The record reflects this Courts' order of September 26, 1985, granting the Debtors' motion asking this court to enter into § 502(c) estimation process in regard to allowance of the entire group of employee claims in this case.

8. Therefore, in addition to this claim, this Court is presently engaged in working through the claims allowance process on this group of claims. The schedules of the Debtors reflect that approximately $70 million of employee claims are admitted and unchallenged. These claims, which vary in number and individual dollar amount fall into such allowable categories as pension benefits, unpaid pre-petition wages, accrued but unused vacation pay, unpaid medical and dental bills incurred pre-petition and covered by programs then in effect, and unpaid employee expenses incurred pre-petition and eligible for reimbursement under programs then in effect. Hearing dates and briefing schedules have been previously established by previous order of the Court on the contested employee claims, and a process for resolution of this group of claims has been established herein. A true copy of that order and schedule is marked attachment B, attached hereto and made a part hereof.

## CONCLUSIONS OF LAW

1. Section 502(b) of the Bankruptcy Code, 11 U.S.C. § 502(b), requires the Bankruptcy Court to liquidate all claims, and Section 502(c) mandates that the Court estimate such claims where liquidation would unduly delay the administration or closing of the case. *In re Brints Cotton Marketing, Inc.* 737 F.2d 1338 (5th Cir. 1984); *In re Towner Petroleum Co.* 48 B.R. 182, 187 (Banker.W.D.Okla.1985); *In re Nova Real Estate Investment Trust,* 23 B.R. 62, 65 (Bankr.E.D.Va.1982).

2. Section 502(b)(1) provides that a claim against an estate in bankruptcy is to be disallowed if such claim "is unen-

1. See attachment A.

forceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." The value of a bankruptcy claim for contract breach must therefore be determined in precisely the same way that such a claim would be determined if the bankruptcy had not occurred. *In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr.D.N.J. 1981); 3 *Collier on Bankruptcy* para. 502.-02, at 502–24 *et seq.* (15th ed. 1985). Pursuant to 11 U.S.C. § 365(q) in a breach of contract claim, a bankrupt may assert any defense to the liability flowing from the statutorily created breach which any other promisor in breach of contract may assert. *Mazirow v. Grigsby (In re White Motor Corp.)*, 44 B.R. 563 (N.D.Ohio 1984).

3. The Bankruptcy Court must determine the allowability of claims for both summary judgment and estimation purposes by applying the appropriate substantive law which would be applied in the non-bankruptcy context. *See, e.g., Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*, 642 F.2d 744, 748 n. 8 (5th Cir.1981); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946).

4. Here, the record reflects, as shown above that the rejected contracts were entered into pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, as expressly stated at the outset of each contract. In applying the appropriate law, this Court concludes that a Railway Labor Act contract, "like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by the federal law, in the federal courts." *IAM v. Central Airlines, Inc.*, 372 U.S. 682, 692, 83 S.Ct. 956, 962, 10 L.Ed.2d 67 (1963). The Supreme Court has also held that "the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws." *Textile Workers of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). *Allis-Chalmers v. Lueck*, ——

U.S. ——, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985).

■ 5. Application of federal claims arising under RLA contracts may not be avoided by labeling a breach of contract claim as "Wrongful Discharge." *Andrews v. Louisville & N.R. Co.*, 406 U.S. 320, 323–34, 92 S.Ct. 1562, 1564–70, 32 L.Ed.2d 95 (1972); see also *Schroeder v. Trans World Airlines, Inc.*, 702 F.2d 189, 192 (9th Cir.1983); *cf. Allis-Chalmers v. Lueck*, supra 105 S.Ct. at 1910–1911 (1985). Federal labor law therefore controls the determination of remedies for breach of these RLA collective bargaining agreements.

6. However, the unions here attempt to base the wrongful discharge claims neither on the collective bargaining agreements nor the Railway Labor Act under which those agreements arise, but rather on state law. This court concludes that this theory is incorrect, and the union claims are preempted by federal law. *Andrews v. Louisville & N.R. Co., supra.* Application of the preemption principle of *Andrews* cannot be avoided by the union contention that the rejection of the collective bargaining agreements eliminated the grievance procedures contained therein, thereby removing contractual remedies and allowing state law remedies to fill the vacuum. The holding in *Andrews* was more than just procedural. The Supreme Court's decision makes clear that wrongful discharge claims are preempted because the "source" of any right not to be discharged must be either statutory or contractual, and that federal labor law would govern both. 406 U.S. at 324, 92 S.Ct. at 1565. The Supreme Court made a similar point in *Allis-Chalmers v. Lueck, supra.*

> If the policies that animate § 301 are to be given their proper range, however, the preemptive effect of § 301 must extend beyond suits alleging contract violations. *These policies require that "the relationships created by [a collective-bargaining] agreement" be defined by application of "an evolving federal common law grounded in national labor policy." Bowen v. United States*

*Postal Service,* 459 U.S. 212, 224–225, 103 S.Ct. 588, 596, 74 L.Ed.2d 402 (1983). The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by re-labeling their contract claims as claims for tortious breach of contract. (emphasis supplied). 105 S.Ct. at 1911

The same considerations support preemption in the Railway Labor Act context. See *IAM v. Central Airlines,* supra, 372 U.S. at 691–692, 83 S.Ct. at 962 ("the validity, interpretation, and enforceability [of Railway Labor Act contracts] cannot be left to the laws of the many States.... The needs of subject matter manifestly call for uniformity.").

■ 7. Even if rejection of the contracts prevented affected employees from pursuing claims through the contractually-created grievance procedure that might otherwise have applied, it did not eliminate a method for the employees to redress those claims. The only consequence of rejection during a bankruptcy proceeding is that the claims must now be filed in and heard by the Bankruptcy Court. As the Supreme Court held in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), "claims arising after filing, such as result from the rejection of an executory contract, must also be presented through the normal [bankruptcy] administration process by which claims are estimated and classified." 104 S.Ct. at 1198 (citing 11 U.S.C. § 502(g) and cases). This Court concludes that the contract re-

jection in bankruptcy therefore in no way undercuts the *Andrews* holding that the Railway Labor Act preempts claims for wrongful discharge arising out of the breach of a collective bargaining agreement. *Bildisco,* in fact, actually defines the procedure to be followed with these claims when a bankruptcy situation exists.

8. In estimating the claims here, using the applicable law as required above, this court finds no reason why "resolution of the proceeding (here) requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce, "28 U.S.C. § 157(d) as argued by the unions in a motion preliminary to this action. There, the unions requested, and this court denied, stay of consideration of this action, until the unions' motion to withdraw the reference pursuant to 157(d) of the Bankruptcy Code could be heard and decided by the District Court. This Court has by previous order defined "laws of the United States," in the context of § 157(d) to mean "statutes." In this regard, the mandate of the Supreme Court in *Allis Chalmers v. Lueck,* supra, appears clear that resolution of this matter is not grounded in "consideration of both Title 11 and other laws of the United States, § 157(d), *supra,* but rather by "application of an evolving federal common law grounded in national labor policy." 105 S.Ct. at 1911, citing *Bowen v. United States Postal Service,* 459 U.S. 212, 224–225, 103 S.Ct. 588, 596, 74 L.Ed.2d 402 (1983).

9. The attempt to characterize the changes in pay rates and work rules on September 14, 1983 as a wrongful "constructive" discharge fails in any event, because none of the prerequisites to a finding of wrongful constructive discharge can be met as previously held by this Court in its Conclusions of Law granting Debtors' motion for Summary Judgment or Request to Estimate Claim Value at Zero With Respect to Contract Rejection Claims of Strikers at para. 13. There, this court held that, "a constructive discharge is an imputed, rather than actual, discharge." Case law es-

tablishes that such may be imputed where an employer acts to make conditions intolerable with the intent and effect of forcing the employee to quit. As previously held here, in order to find that the changes in rates of pay and working conditions implemented on September 24, 1983 constituted a wrongful constructive discharge en masse, a court would have to conclude (1) that the pilots and flight attendants actually terminated their employment as a result of those changes; (2) that Continental acted without business justification and with anti-union animus in making the changes; (3) that the changes created by the emergency work rules were intolerable; and (4) that the changes were in some way unlawful and "wrongful," *i.e.*, they must violate a legal duty owed by the employer to the employee, such as the duty not to discriminate on the basis of union membership. *See NLRB v. Cable Vision, Inc.*, 660 F.2d 1 (1st Cir.1981); *J.P. Stevens & Co. v. NLRB*, 461 F.2d 490, 494 (4th Cir.1972); *Newspaper Guild of Boston v. Boston Herald-Traveler Corp.*, 238 F.2d 471, 472 (1st Cir. 1956); *Guardian Ambulance Serv.* 228 N.L.R.B. 1127, 1130 (1977); *Highland Avenue Convalescent Home, Inc.*, 220 N.L.R.B. 998 (1975).

■ 10. Again, as previously held in paragraph 14 of the above cited striker Damage Conclusions of September 10, 1985, there is no evidence in this case that the events of September 24, 1983 included mass terminations, either actual or constructive, of pilots or flight attendants. The unions' claims are asserted on behalf of pilots and flight attendants who went on strike. *The unions do not claim that their members were actually involuntarily discharged on September 24, 1983, nor do they claim that the strikers voluntarily terminated their employment.* (emphasis supplied) The previous finding here that Continental began strenuous efforts to get the pilots to return to work immediately after filing its bankruptcy petitions to this court further refutes the constructive discharge claim. This Court therefore rejects any suggestion that a strike may be equated with a constructive discharge.

*Int'l Union of Elec. Workers v. NLRB*, 604 F.2d 689, 698 n. 28 (D.C.Cir.1979); *see Waples Platter Co.*, 49 N.L.R.B. 1156, 1159 (1943), *enf'd as modified*, 140 F.2d 228 (5th Cir.1944). The fact that the pilots and flight attendants on whose behalf these claims are asserted were not discharged and did not resign but rather went on strike in and of itself precludes a finding of wrongful discharge.

11. ALPA and UFA included in their damage calculations only those pilots and flight attendants who had not returned to work on the date they prepared their claims in the Spring of this year. It is important to note that since that time, UFA has called off its strike and numerous additional flight attendants have returned. Although the ALPA strike remains ongoing, many pilots appear to have also returned to work at Continental, according to other records in this case.

12. Continental has previously been found to have had a valid business justification for the changes in wages and work rules implemented on September 24, 1983. This Court has already expressly found compelling business justification for Continental's actions, and has rejected a claim by these unions that Continental acted in bad faith in implementing new work rules on September 24. *See In re Continental Airlines Corp., et al.*, 38 B.R. 67 (Bankr.S. D.Tex.1984); Memorandum of Authorities Authorizing Rejection of ALPA Collective Bargaining Agreements (August 17, 1984).

13. The changes in wages, work rules and working conditions for Continental pilots and flight attendants on September 24, 1983 were not legally "wrongful" because they were approved as legal and proper by this Court's June 19, 1984 and December 5, 1984 decisions allowing the rejection of the collective bargaining agreements with ALPA and UFA, respectively. This court there held that in accordance with *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the changes in wage rates and work rules implemented by Continental on September 24, 1983 "were

accomplished not by the employer's unilateral action, but rather *by operation of law.*" Memorandum of Authorities Authorizing Rejection of ALPA Collective Bargaining Agreement at 35 (emphasis in original). The Court there also rejected the unions' claim that the implementation of wage rates and work rules that differed substantially from those in the collective bargaining agreements would violate the status quo provision of the Railway Labor Act, 45 U.S.C. § 156. *See* Memorandum of Authorities Rejection of ALPA Collective Bargaining Agreements at 30–31. The Court further held that the *"the rationale of the Supreme Court in Bildisco is equally applicable to the Railway Labor Act and the status quo provisions of that Act must give way to the realities of bankruptcy."* Memorandum of Authorities at 37–38. (emphasis supplied) Thus, in complete accord with *Bildisco,* this Court then expressly held that the rejection of Continental's labor agreements and the changes in wages and work rules implemented on September 24, 1983 did not violate the Railway Labor Act. Memorandum of Authorities at 38–39.

■ 14. The Court now rejects the suggestion that it is unnecessary to show that Debtors acted with an illegal intent or motive, or otherwise acted unlawfully, in order to find a wrongful discharge. The standards for constructive discharge under both employment discrimination cases and NLRB decisions require that the employer's actions have an illegal basis, such as an anti-union motivation. *See, e.g., NLRB v. Tricor Products, Inc.,* 636 F.2d 266, 271 (10th Cir.1980) (law is settled that where employer *deliberately* makes an employee's working conditions intolerable *and forces him to quit because of union activities or membership,* constructive discharge may be found).

■ 15. The Court also rejects the suggestion that rejection of the contracts alone gives rise to a claim for wrongful discharge damages. That suggestion is not the law. This court holds that it is not the mere fact of contract breach, but the independent unlawfulness of that conduct, that renders any resulting discharges or resignations "wrongful." That changes in wages and work rules constituted a breach of contract due to rejection is not an unfair labor practice. *NLRB v. Bildisco & Bildisco, supra,* 104 S.Ct. at 1197–1201. As shown, and to reiterate, the affected employees have a remedy for any legitimate losses they may have as a result of the breach by virtue of their ability to file claims for damages resulting from contract rejection as shown by example in paragraph 8 of the findings of fact above and in footnote 12 of *Bildisco,* where "claims such as unliquidated losses attributable to fringe benefits or security provisions like seniority rights", *supra* at 1199, were recognized.

16. The decisions of the NLRB in *Film Projects, Inc.,* 231 N.L.R.B. 1370 (1977), and *Central Dispatch, Inc.,* 229 N.L.R.B. 979 (1977), which the unions cite to support their claim, are inapposite. In those cases, the NLRB expressly found that the employer's unilateral reductions in wages constituted an unfair labor practice, that the changes in those circumstances constituted a wrongful discharge of the affected employees, *and* that the employer wrongfully refused to reinstate the employees thereafter. To distinguish here, the changes implemented on September 24, 1983 did not violate the Railway Labor Act and have already been held to be lawful. There were no mass terminations, either voluntary or involuntary, and Continental made strenuous efforts to persuade the striking employees to return to work rather than refusing wrongfully to reinstate the employee thereafter. Because the breach itself was not unlawful or wrongful, there can be no finding that any alleged wrongful constructive discharges exist for which a cause of action arises for a claim against these Debtors.

17. The unions assert that their claims for damages arising from wrongful discharge are substantively distinct from their claims for damages arising from contract rejection. This Court, however, does not find that alleged distinction to be meaningful or real or to have a sound footing in

applicable case law. Examples of the union arguments are: ALPA states that the remedy for wrongful discharge is "an award of prospective wages that would have been earned were it not for the wrongful discharge." ALPA also asserts that damages should be measured by the expected duration of employment, which according to ALPA would require payment of wages and benefits to retirement age. UFA then describes its wrongful termination claims as "damages for loss of [flight attendants'] seniority rights, loss of wages attributable to future employment at Continental, and other equitable relief arising from the unique employer-employee relationship that Continental upset when it filed for rejection." UFA nowhere explains how these claims differ from ordinary contract rejection damage claims shown by example in the findings above or *Bildisco's* express statement cited in footnote 12 above as being among "losses occasioned by the rejection of a collective bargaining agreement." *NLRB v. Bildisco & Bildisco, supra,* 104 S.Ct. at 1199 n. 12.

■■ 18. Although the Bankruptcy Code recognizes a remedy for breach of a collective bargaining agreement, 11 U.S.C. § 502(g), the Bankruptcy Code does not permit the presentation of two claims and the recovery of double damages for what is essentially one legally compensable claim. Nevertheless, it would appear from an examination of the claims file in this case that the unions, as well as numerous individual claimants, have pursued that remedy in the form of multiple claims for contract rejection damages. The Code has no language or any indication that employee claimants are permitted, first, a claim for standard damages, and then, to assert a second claim for damages arising out of contract rejection, also measured by the wages and benefits provided for in the contract, but extending into the future far beyond the contract expiration date. It appears settled that allowance of such a claim is precluded by established Fifth Circuit law limiting damages for breach of contract to the period remaining in the term of the contract. *IBT v. Standard Brands,* 579 F.2d 1282, 1295 (5th Cir.1978), *cert. denied,* 443 U.S.

913, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979); *see Sun Oil Co. v. NLRB,* 576 F.2d 553, 558 (3d Cir.1978).

■■ 19. However, even if such a claim as described in paragraph 17 above were allowable in this bankruptcy proceeding, which it is not, an award of damages to the date of retirement would also conflict with 11 U.S.C. § 502(b)(7), which applies to claims arising from rejection of collective bargaining agreements and limits "the claim of an employee for damages resulting from the termination of an employment contract" to one year. *See In re Cortland Container Corp.,* 30 B.R. 715 (Bankr.N.D. Ill.1983). The meaning of this language is plain and clear in and of itself. Moreover, a review of the legislative history of this section reveals no congressional intention that contract rejection could give rise to any such alternative remedy that would completely eviscerate its express restriction on damages.

20. This Court's prior decisions are the law of this case, and as such, are binding on the parties, and cannot be collaterally attacked in this claims proceeding. *See Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Messenger v. Anderson,* 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); *White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967).

■■ 21. Lastly, the unions' contention that jobs were "eliminated" by virtue of the changes in wage rates and work rules and their reliance on administrative decisions of the United States Department of Labor and state unemployment compensation commissions to support that proposition is misplaced and incorrect. Moreover, that contention does not detract from this Court's earlier decisions. As the unions' constructive discharge argument shows, no claim or argument is being made that pilots and flight attendants were actually terminated by Debtors, nor that they resigned as a result of the new wages and work rules. Rather, it appears from the record that these individuals, now claimants, concededly either chose to return to their jobs or to go on strike. The record indicates that there is no dispute that the new wage rates

and work rules differed significantly from those under the contracts. However, the fact that some administrative agencies, based on various proceedings, which at times appear to have been held without notice to or participation by Debtors, and which did not address wrongful discharge issues, may have characterized the pre-petition jobs as being eliminated by those changes for purposes of the particular statutory programs they administer are clearly neither proper precedent nor binding here and does not justify ignoring the controlling Supreme Court and other federal case law that precluded recognition of the unions' wrongful discharge claims. These proceedings have been cited by the unions, and to some extent by the Debtors, with some evidence of their existence placed in this record as shown. However, the proceedings are held to be completely inapplicable for the reasons cited.

22. This motion presents a pure issue of law—whether the striker claimants are entitled to damages for lost future wages and fringe benefits pursuant to the unions' legal theory of wrongful discharge. To decide this motion, this Court need not decide any factual issues, such as the number and identity of those on strike and when, or whether the strikers failed to mitigate damages. The claim amount or the total amount by which the claims would be reduced if the Debtors prevailed on this motion also need not be considered in resolving these questions.

23. No affidavits or other admissible evidence have been offered to establish that there is a genuine dispute as to any material fact. Because this Court is persuaded that Continental is entitled to judgment as a matter of law, summary judgment is appropriate and will be granted. *See* Fed. R.Civ.P. 56(e).

24. For the foregoing reasons, the union claims for damages for wrongful discharge will be disallowed.

25. This Court further rules that the unions' claims for wrongful discharge damages on behalf of pilots and flight attendants have no validity and are without merit as a matter of law, and the value is esti-

mated, pursuant to 11 U.S.C. § 502(c), to be zero, based on the Court's conclusions above. These Findings of Fact and Conclusions of Law are hereby incorporated into and made a part of the order attached hereto.

### ATTACHMENT A

Specifically, ALPA claimed damages for "wrongful separation from service arising from the unlawful and unilateral abrogation of the rates of pay, rules of work and working conditions of the Continental pilots on September 24, 1983" in the amount of $1,328,726,655.00 (Amended Proof of Claim of Air Line Pilots Association ¶ 4), and UFA claimed damages for "termination of employment of UFA-represented Flight Attendants who have not been returned to work by Continental, including damages for loss of intangible benefits, including but not limited to seniority and other rights" in the amount of $110,000,000.00 (Union of Flight Attendants Claim No. 7 ¶ 3(c)).