### In re CONTINENTAL AIRLINES CORPORATION, Debtor.

### In re CONTINENTAL AIR LINES, INC., Debtor.

### In re TEXAS INTERNATIONAL AIRLINES, INC., Debtor.

### In re TXIA HOLDINGS CORPORATION, Debtor.

Bankruptcy Nos. 83–04019–H2–5, 80–04020–H1–5, 83–04021–H3–5, and 83–04022–H3–5.

United States Bankruptcy Court, S.D. Texas, Houston Division.

Jan. 17, 1984.

Michael E. Abram, James L. Linsey, Cohen, Weiss & Simon, New York City, Chris Dixie & Associates, Houston, Tex., for Air Line Pilots Ass'n, Intern.

Joseph P. Manners, John O'B. Clarke, Jr., Kimberly A. Madigan, Highsaw & Mahoney, Washington, D.C., Marc A. Zito, Houston, Tex., for International Association of Machinist & Aerospace Workers, AFL–CIO.

Jay D. Roth, Anita C. Knowlton, Taylor, Roth & Hunt, Los Angeles, Cal., Stephen M. Vaughan, Mandell & Wright, Houston, Tex., for Union of Flight Attendants.

Professor Vern Countryman, Harvard Law School, Cambridge, Mass., Special Counsel to the Union Parties.

Barry Simon, Houston, Texas, Lenard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., John A. Donovan, David Lombardero, Hughes, Hubbard & Reed, Los Angeles, Cal., John J. Gallagher, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Continental.

Judge William M. Schultz, B.J. Walter, Houston, Tex., for Official Committee of Unsecured Creditors.

Phillip Pierce, Booth, Lipton & Lipton, New York City, for Labor & Pension Committee.

## Memorandum Opinion On Motion To Dismiss

R.F. WHELESS, Jr., Bankruptcy Judge.

■ On September 24, 1983, Continental Airlines Corporation and the above-related entities filed a voluntary Chapter 11 proceeding under Title 11 of the United States Code. On September 27, 1983, Continental Air Lines, Inc., and Texas International Airlines, Inc. filed a joint motion to reject their Collective Bargaining Agreements and other employee-related executory contracts. On the 11th of October 1983, three of the debtors' unions (representing approximately one-half of the employees of Continental Airlines) jointly filed a motion to dismiss the proceeding; alleging as their principal ground that the Chapter 11 was filed in bad faith and further alleging that rejection of these contracts would violate the United States Constitution.

Immediately upon filing its Chapter 11, Continental Airlines unilaterally imposed on its employees new wage rates and work rules which had the effect of making those costs comparable with those of "New Entrant" airlines who are in competition with Continental. It also cut back severely on its operations.

The unions filing the motion to dismiss were the Air Line Pilots' Association ("ALPA"), the Union of Flight Attendants ("UFA"), and the International Association of Machinist and Aerospace Workers ("IAM"). The debtors and the Unsecured Trade Creditors Committee have opposed the motion.

The evidence taken at the hearing on the motion to dismiss consumed 11 days of testimony, including two evening sessions to 10:00 p.m.; two evening sessions to 12:00 p.m.; and one evening session to 1:15 a.m. A considerable amount of evidence in oral and in written form was introduced. Both parties have filed extensive briefs. The oral arguments extended for approximately 4 hours. The matter has been thoroughly presented to the court by all parties.

The evidence showed that since the airlines were deregulated in 1978, Continental Airlines (and Texas International when considered on a combined basis) has lost money consistently. Up to September 24, 1983, the date of filing, Continental Airlines had lost $521,900,000, as follows:

| | | |
|---|---|---|
| 1979 | lost | $ 27.4 million |
| 1980 | lost | 76.8 million |
| 1981 | lost | 138.6 million |
| 1982 | lost | 119.9 million |
| 1983 to September 24 | lost | 159.2 million |
| | | $521.9 million |

These losses were caused in some part by the fact that the new entrant airlines have lower labor costs and can and did charge lower fares than Continental could charge and still make money on routes where they were flying in competition. The new entrant airlines have increased these competitive routes in the past several years and have even run Continental Airlines out of some markets.

The unions have not challenged the fact that Continental Airlines has lost substantial sums of money; nor that the company was in a severe financial crisis at the time of the filing. In fact, ALPA and UFA both indicated in testimony that they were willing to agree to the dollar amount of the labor cost concessions which had been requested of them by the company, and indicated that agreement to these concessions (which they were not lawfully required to make) was motivated by the recognition of these two unions that Continental Airlines was having a significant financial crisis. However, although efforts had been made to get agreement on concessions since the first of the year and longer, no agreement had been reached with these unions at the time of the filing of this proceeding.

The IAM appeared to be taking the position that the financial condition of the com-

pany was not a significant element of consideration in negotiating for their new contract. The IAM had refused an increase of wages in their agreement with Continental Airlines and held out for what they termed "industry standards"; even though the rates requested were higher than with many other carriers. On August 13, 1983, the IAM struck the airlines. Its purpose was to shut down its operations. It is still on strike.

The unions did offer testimony that Continental had weathered a bad cash crisis in the winter of 1982–83 and argued that this crisis was much worse than the cash crisis of the airline at the time of filing of the proceeding. The unions argue that this comparison shows that Continental Airlines could have survived its cash predicament of September 1983 had it chosen to do so. However, while Continental Airlines' cash position was worse in the winter of 1982–83, it nevertheless had resources which it did not have in September 1983. It had unencumbered assets which it sold for cash, and it was projecting an upswing in its profit picture. This enabled it to obtain credit from several sources.

Texas Air Corporation, an affiliate, purchased City of Houston Bonds on which Continental Airlines was principal obligor. This raised $7.75 million for the debtor. The debtor sold a subsidiary for $15 million. The debtor obtained $25 million revolving credit from major lenders. It obtained $37.5 million in April 1983 by public offering and $40 million from American General Corporation by a secured loan. These transactions enabled Continental Airlines to survive its cash crunch in the winter of 1982–83.

By September 24, 1983, Continental Airlines had sold its free assets. It had experienced severe losses in 1983 instead of gains it had been predicting and had no optimistic outlook for the future. It had lost $23 million in the July-August period, traditionally its most favorable period of operations, and was facing the winter season, traditionally a poor season in the airline industry.

At filing, Continental Airlines was unable to pay its debts as they matured. The company had $42 million in unsecured trade debts which it had not paid timely and which it could not pay in full. It was in violation of the liquidity provisions of its loan agreements with secured lenders and was facing substantial payments of interest and principal on its secured loans in the near future; which it had no means to pay. It was projecting that even under favorable assumptions that it would run out of cash by the end of September 1983. It had no reasonable source of additional capital; given its profit and loss history, its existing cost structure, and the industry competition it was facing. It had no credit. It had not yet reached agreement or deferral of some of its principal payments and had been refused deferral of interest payments on its secured debt. Many of the trade creditors had threatened to cut off services. Had this occurred, the airline service could have been interrupted involuntarily and public confidence would have eroded rapidly and might never have been restored.

It had made efforts to obtain adjustments in its existing collective bargaining agreements but the unions were not required to agree to these requests and no agreement had been reached. Indeed, the adjustments which had been requested would no doubt have required substantial reduction in pay and work benefits for these employees, and it can be seen why these adjustments were not readily acceptable to ALPA and UFA; especially in light of an apparent feeling of distrust of management.

The evidence showed that there was no way for Continental Airlines to repay its obligations nor even to continue its operations for very long in the future, as things then existed. Had the airline not filed its Chapter 11 proceeding when it did, it would not have been flying for very much longer, its 6,000 remaining employees would now be out of a job or working elsewhere, and its ability to reorganize would have been further seriously impaired.

This court finds that the Continental Airlines group filed their respective Chapter 11 proceedings for the purpose of attempting to keep the companies alive and functioning and that they had no other viable alternative to that end. The unions have not satisfactorily demonstrated that there was any reasonable alternative under which the airline would keep operating,[1] and this court finds that there was none.

Further, had not Continental Airlines filed their Chapter 11 proceeding when they did, an involuntary proceeding might well have been filed against them, and, as they were not paying their debts as they matured, an order for relief would have been entered. The Unsecured Trade Creditors Committee has advised that if this proceeding is dismissed, the Committee will instantly file such an involuntary proceeding.

 This court would reject any argument that a financially troubled company, which is losing money and is insolvent (or nearly so), is unable to pay its debts as they mature, has no credit and no free assets, and is about to run out of cash; nevertheless, cannot file a Chapter 11 proceeding if rejection of its collective bargaining agreements is a planned element in the reorganization of its business.

 If Congress had the intention to prohibit such filings when it enacted the Bankruptcy Code, it did not make this intention clear to this court. Indeed, this court feels that the Railway Labor Act and the Bankruptcy Code are compatible. Each has a special and a separate purpose. Congress enacted the Bankruptcy Code in 1978, effective October 1, 1979. A number of cases had already held that collective bargaining agreements can be rejected by a Chapter 11 debtor under the provisions of the prior Bankruptcy Act under certain circumstances. But the Congress did not see

fit to provide otherwise in the language of the Bankruptcy Code. This must have been intentional on the part of the Congress; although differences still exist among authorities as to what circumstances are required to be shown before such agreements can be rejected.

However, the unions state that they are not making the above-mentioned argument. They argue that the *sole*, or at least the *primary* purpose in filing was to reject these agreements and that Continental Airlines has not shown that it intends to reorganize through and by a Plan of Arrangement. This court has determined the facts to be contrary to this proposition. The debtors have shown themselves to have a need for this proceeding in areas other than with respect to collective bargaining agreements.

 The court finds that Continental Airlines filed this proceeding only when management felt it had no acceptable alternative if it were to have a chance to keep the airline flying; the court further finds that there was no intent or motive to abuse the purpose of the Bankruptcy Code. One of the purposes of the Bankruptcy Code is to give a business an opportunity to catch its financial breath, propose a plan to reorganize and to thereby allow it an opportunity to cure its financial ills and continue in business. No small part of this purpose is to preserve jobs. The objectives of the debtors were to make lawful use of the provisions of Title 11 of the United States Code to this end and such objectives were therefore consistent with the purposes, spirit, and intent of that statute. That one of the intentions of the debtors was to seek rejection of their collective bargaining agreements insofar as that may be allowed under the provisions of Title 11, does not, under these facts, result in the filing being "in bad faith" as that term is defined at law. Neither the sole nor primary purpose

---

**1.** Presumably the Unions do not argue that Continental Airlines could not have filed a Chapter 7 liquidation proceeding; which would have resulted in a shutdown of operations, an immediate loss of all jobs of all employees and would further result in a rejection of all collective bargaining agreements as a matter of law 60 days after filing, unless assumed by a trustee as being beneficial to the estate. A non-operating trustee could not have properly done this. Most certainly, this alternative would not have served the purposes of the Railway Labor Act.

of the filing was to reject these executory contracts; although it is clear that at filing Continental Airlines expected to be able to do this under the provisions of that law.

This court rejects the notion that the filing was "engineered" over a period of time by management as the means by which it could reject these contracts. The primary purpose in filing these proceedings was to keep the airline operating so as to best utilize its going-concern value. The management of the company owed this obligation to its shareholders and to its creditors.

This court declines to determine the issue of the constitutionality of rejection of collective bargaining agreements under the provisions of 11 U.S.C. § 365. This issue is not now directly before this court but will be determined as part of the debtors' effort to reject these agreement beginning January 30, 1984 at 9:00 a.m., 5th Circuit Court of Appeals Courtroom, 11th Floor.

Since ALPA & UFA have indicated that they were in agreement to the dollar amount of concessions requested by Continental Air Lines, the debtor is requested to present to these unions a definitive proposal as an offer of settlement of the issues relating to rejection of the union contracts. All parties must be prepared to certify that all settlement negotiations have been exhausted by the time of the commencement of trial on January 30, 1984.

The motion of the unions to dismiss these proceedings is denied.