**In re SOUTHERN CALIFORNIA SOUND SYSTEMS, INC., Debtor.**

**Bankruptcy No. 86–06187–LM11.**

United States Bankruptcy Court, S.D. California.

Feb. 10, 1987.

---

James W. Dempsey, Dempsey & Duff, Vista, Cal., for debtor.

James D. Baskin III, Hill & Baskin, San Diego, Cal., for SMI, et al.

Stephen D. Petach, Jones, Hatfield & Penfield, Escondido, Cal., for Mr. Vale, an individual.

David A. Puzo, Carlsbad, Cal., for Mr. Laughter, an individual.

### Memorandum Decision

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

Debtor-in-possession, Southern California Sound Systems, Inc. ("SCSS" or "Debtor") has moved this Court to reject an executory contract between itself and Starburst Marketing International, Inc. ("SMI"). SMI has made cross-motions to dismiss this case as a bad faith filing, to abstain from exercising jurisdiction in this case or, in the alternative, for appointment of a trustee. In addition, SMI seeks sanctions, including the attorneys fees and expenses incurred by SMI as a result of this bankruptcy filing.

### BACKGROUND

Debtor is a corporation which was organized in May 1986. Debtor's schedules reflect the following persons have equity ownership in excess of 20% of the issued stock in the corporation: Ronald Vale, George Carlson, Thomas Myers and William Myers.[1] The Myers brothers obtained ownership in the corporation by purchasing shares previously held by George Carlson, a prior director of the corporation. SMI is a corporation formed in July 1986, whose principals are the two Myers brothers.

Vale and Steven Smith, another shareholder and former director, developed a technologically advanced loudspeaker system. In furtherance of their desire to produce and market these units, debtor entered into an exclusive licensing agreement with SMI. The agreement provides that SMI has an exclusive license to sell all units produced throughout the world, as well as exclusive rights to any trademarks. The agreement also provides that SMI will purchase a minimum of 80% of all units made by SCSS during the first six years after full production, as defined in the agreement, is met. In the event that debtor is unable or unwilling to produce sufficient units to satisfy SMI's requirements, debtor agrees to grant SMI a license of the patent to make the units. Upon exercise of this provision, SMI is obligated to pay debtor a royalty of six percent of the net selling price for each unit sold.

No sooner had the ink on the agreement dried than disputes arose concerning its performance. Debtor contacted potential investors to finance production of the units, including an entity called the "Randall Group." Believing that its interests in the agreement were being jeopardized, Thomas Myers, president of SMI and one-time vice-president of debtor, contacted the Randall Group to voice his opposition to the negotiations between debtor and Randall. Shortly thereafter, the Randall Group withdrew from considering whether to invest $10 million in debtor's project. On August 21st, debtor attempted to rescind the licensing agreement with SMI. On September 24th, SMI and the Myers brothers filed an action in state court against debtor, seeking damages of $6 million for breach of contract or for specific performance of the agreement. Later that same day, debtor filed its petition for Chapter 11 relief.

In support of its motion to reject the contract, debtor argues that the agreement has a built-in 20% loss for the debtor because SMI is only required to purchase 80% of all units produced, and the terms of the agreement prohibit debtor from selling this 20% elsewhere. Debtor argues that the contract is burdensome and that its only hope of reorganization is to reject the contract. Debtor also argues that the equities favor the granting of its motion, since its principals are the developers of the technol-

---

1. Debtor disputes the shareholder status of William Myers and Thomas Myers.

ogy and should therefore reap any profits from its utilization.

In response, SMI argues that the sole reason debtor filed for relief was to reject the exclusive licensing agreement. SMI disputes debtor's contention that the licensing agreement guarantees a 20% annual loss for all units produced. Further, SMI argues that the six percent royalty provision adequately compensates debtor's principals for their efforts in developing this technology if they decide not to proceed with production because of the agreement's other provisions.

It is undisputed that debtor and SMI no longer have the capacity to work together to produce these loudspeaker systems. Debtor's motion to reject executory contract filed October 30, 1986, understates this observation: "The management teams of the respective companies have developed a dislike and distrust for each other." (At page 7).

Debtor's schedules reflect unsecured debts of $107,769.25. Included in this figure are $88,000 of loans made by directors Smith and Vale to the corporation. Excluding these insider loans, debtor has unsecured obligations of $19,769.25, owing to nine creditors. These obligations range in size from $82 to $6,425.

Full production as defined in the agreement contemplates gross sales of $5,238,-000 annually. Given the 15–year term of the agreement, the potential dollar value of this contract is $78,570,000, assuming complete performance of the agreement. Thus, considering the size of this contract, the unsecured debts are minimal.

Debtor's schedules reflect assets of $67,-456. Thus, excluding insider loans, debtor's schedules indicate that more than sufficient assets exist to pay all unsecured creditors in full.

Debtor's schedules reflect the existence of two executory contracts for the production and sale of the speakers. The first is the above-described "exclusive licensing agreement" with SMI. The second is a "non-exclusive sub-license agreement to manufacture and sell SCSS speakers for royalty payment" with Acoustic Integrity, Inc.

## ISSUES

I. Whether debtor should be allowed to reject this executory contract under 11 U.S.C. § 365(a).

II. Whether this Court should dismiss this case pursuant to 11 U.S.C. § 1112(b) as not being filed in good faith or abstain from exercising jurisdiction pursuant to 11 U.S.C. § 305(a).

III. Whether sanctions should be awarded pursuant to Bankruptcy Rule 9011.

I

## EXECUTORY CONTRACT

Rejection of an executory contract is governed by the provisions of 11 U.S.C. § 365(a). Section 365(a) provides in pertinent part:

> The trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 1107(a) gives SCSS the power to seek court authorization to reject its contract with SMI.

Section 365 does not set forth the criteria that should be utilized to determine whether rejection of an executory contract is appropriate. Most courts have allowed the trustees to exercise their business judgment in determining which contracts to assume or reject. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742–43, 87 L.Ed. 959 (1943); *In re Huang*, 23 B.R. 798, 800–01 (9th Cir. BAP 1982); 2 *Collier On Bankruptcy*, § 365.03 (15th ed. 1984). However, as *Collier* cautions, one factor to be considered in the exercise of business judgment is the size of the claim flowing from the breach caused by rejection. *Id.* at 365–18.

SCSS contends that its contract with SMI is burdensome and that rejection of this

contract is crucial to its attempt to successfully reorganize. In response, SMI argues that the contract is not burdensome, given the clause providing for a six percent royalty payment in the event debtor cannot perform under the licensing agreement. Moreover, if debtor were allowed to reject this contract, SMI argues that the resulting damages occasioned by the contract's breach would produce such an enormous unsecured claim, that all other unsecured claims would receive little or nothing under any plan of reorganization. SMI further argues that it would be inequitable for this Court to allow rejection of the contract so that debtor might assume the non-exclusive marketing agreement it has executed with Acoustic Integrity, Inc.

In support of its motion to reject this contract, debtor cites the case of *In re Continental Airlines Corp.*, 38 B.R. 67, 11 B.C.D. 623 (Bankr.S.D.Tex.1984). In *Continental Airlines*, a beleaguered airline company filed for relief under Chapter 11 in September 1983, and three days later filed a motion to reject its collective bargaining agreement. Three of its contracting labor unions filed motions for dismissal of the case, arguing that debtor had filed for relief in bad faith. In denying the motion to dismiss the case, the court painted a vivid picture of the events as they existed on the date Continental filed for relief.

After the airline industry was deregulated in 1978, Continental had sustained losses amounting to $521.9 million from 1979 to September 1983, increasing annually from $27.4 million in 1979 to $159.2 million in 1983. In part, these losses were caused by the competition of new entrant airlines which had lower labor costs. Competition escalated to the point that Continental was forced out of several markets. At the time of filing, debtor had sustained losses in its peak operating season of July and August 1984, of $23 million, and was about to enter the least profitable season—the winter months.

Moreover, Continental was unable to pay its debts as they came due. Continental had $42 million in unsecured trade debts and was in violation of the liquidity provisions of its loan agreements with secured lenders. Additionally, substantial payments on the secured debts were due shortly which Continental had no means of paying. It had no sources of capital and had been unable to secure a deferral of these approaching payments. Trade creditors had threatened to withhold services which would have shut the airlines down and caused an attendant loss of public confidence, further damaging the airline. Finally, the court noted that at least one entity, the unsecured trade creditors committee, informed the court that if it were to grant the motion to dismiss, it was prepared to file an involuntary petition against Continental.

The court summarized its decision, denying the motion to dismiss as follows, 38 B.R. at 71, 11 B.C.D. at 625:

> This court would reject any argument that a financially troubled company, which is losing money and is insolvent (or nearly so), is unable to pay its debts as they mature, has no credit and no free assets, and is about to run out of cash; nevertheless, cannot file a Chapter 11 proceeding if rejection of its collective bargaining agreements is a planned element in the reorganization of its business. If Congress had the intention to prohibit such filings when it enacted the Bankruptcy Code, it did not make this intention clear to this court.

As was pointed out during oral argument, this case is not the *Continental Airlines* case. Unlike Continental, SCSS is not operating a business. Nor does it have any of the common indicia of an operating business. It has no employees and is not currently producing anything. It has made no sales and consequently has no accounts receivable. Moreover, it has no assets with which to propose and fund a plan of reorganization. Having been so recently formed, the relatively small unsecured debt cannot be seriously delinquent, if indeed, any delinquency exists at all.

The court in *Continental Airlines* specifically found that debtor's motivation for filing for relief under Chapter 11 was to keep the airlines "in business" while it attempted to reorganize its affairs. As the court wrote, 38 B.R. at 71–72, 11 B.C.D. at 625:

The court finds that Continental Airlines filed this proceeding only when management felt it had no acceptable alternative if it were to have a chance to keep the airlines flying; the court further finds that there was no intent or motive to abuse the purpose of the Bankruptcy Code. One of the purposes of the Bankruptcy Code is to give a business an opportunity to catch its financial breath, propose a plan to reorganize and to thereby allow it an opportunity to cure its financial ills and continue in business. No small part of this purpose is to preserve jobs. The objectives of the debtors were to make lawful use of the provisions of Title 11 of the United States Code to this end and such objectives were therefore consistent with the purposes, spirit and intent of that statute. That one of the intentions of the debtors was to seek rejection of their collective bargaining agreements insofar as that may be allowed under the provisions of Title 11, does not, under these facts result in the filing being "in bad faith" as that term is defined at law. Neither the sole nor the primary purpose of the filing was to reject these executory contracts; although it is clear that at filing Continental Airlines expected to be able to do this under the provisions of that law.

In stark contrast to Continental's motivation in seeking Chapter 11 protection, is that of the debtor as expressed in the following passage from the Declaration of Ronald Vale, president of SCSS, filed November 13, 1986, at page 6:

The debtor filed this case for the purpose of rejecting a burdensome contract; to gain the protection offered by the automatic stay provisions under the Code; to buy time after the rejection, to solicit funding for its projects and to thereafter propose and complete a successful plan of reorganization. Without the continued protection of this court, the debtor will expire and the time efforts, monies and energies expended by the principals of SCSS over these past years will all have been for naught.

The conclusion is inescapable that the sole reason SCSS filed for relief was to reject its contract with SMI. This, together with the factual differences noted above, make debtor's reliance on the *Continental Airlines* decision misplaced.

The *Continental Airlines* decision appears to suggest that debtor's motion to reject should be granted. Yet, a different result must obtain in this case. Where the sole objective to be achieved by filing for relief by a not-yet operational entity is to reject a hastily-formed contract in order to avoid the state law remedy of specific performance, the Court should not use its equity powers to assist the debtor in this manipulative endeavor. Here, the debtor is attempting to use its rejection power to create a business rather than preserve one. Although the proper standard in determining whether this Court should authorize rejection of an executory contract is the "business judgment" standard, implicit in the debtor's exercise of this rejection power is good faith and a valid reorganization purpose. Where the Court finds these threshold requirements lacking, the Court need not further test rejection by application of the business judgment standard.

The reasoning and result in the recent opinion in *In re Logical Software, Inc.*, 66 B.R. 683 (Bankr.D.Mass.1986), strongly support the decision the Court reaches today. In *Logical Software*, debtor was engaged in the development and licensing of computer software. Debtor operated under a series of exclusive and non-exclusive licensing agreements with various developers for distribution. One of these was an exclusive distribution agreement with an entity called I.T.I., for distribution of the LOGIX program which was one of debtor's principal assets.

The relationship between debtor and I.T.I. had been marked by discord from its inception. I.T.I. had obtained a $17 million judgment against debtor in the U.S. District Court for the District of Maryland. Similarly, debtor had obtained a $5.5 million judgment against I.T.I. for business torts and breaches of contract in the U.S. District Court for the District of Massachusetts. Both judgments were on appeal. In addition to these judgments, a continuing dispute existed concerning the amount of royalties I.T.I. owed debtor.

Debtor filed for relief under Chapter 11 and moved to reject the executory contract with I.T.I. In granting the motion to reject the contract, the court, over the objection of I.T.I., noted the broad deference that should be accorded to a debtor-in-possession's decision to reject an executory contract:

> In the bankruptcy context, the debtor's decision to reject an executory contract should be accepted by the court unless it is shown to be "so manifestly unreasonable that it could not be based on sound business judgment but only on bad faith or whim or caprice." [citing *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045 (4th Cir.1985) *cert. denied* — U.S. ——, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986)]. At 686.

Significant differences exist between the posture of the case presented to the court in *Logical Software* and the instant case. In *Logical Software*, debtor had been operating its computer software business for five years prior to filing for relief. The executory contract it sought to reject was only one of twelve licenses and 5,000 sub-licenses issued on debtor's products. The contract with I.T.I. was executed two years prior to the filing of debtor's Chapter 11 petition, and the motion to reject was brought six months thereafter. Thus, Logical Software, unlike SCSS, was a real company with real debt and real creditors clamoring to enforce it. Significantly, Logical Software attempted to resolve its longstanding disputes with I.T.I. before seeking rejection of the contract. Finally, no evidence was presented to the court to indicate that Logical Software's decision to reject the contract was anything other than the exercise of its sound business judgment as but one step towards successful reorganization.

This result is also consistent with recent appellate decisions involving Chapter 13 cases. *In re Chinichian*, 784 F.2d 1440 (9th Cir.1986); *In re Waldron*, 785 F.2d 936 (11th Cir.1986). Accordingly, debtor's motion to reject this contract is denied.

## II

### BAD FAITH FILING

SMI seeks to have the instant case dismissed as being filed in bad faith. Though 11 U.S.C. § 1112(b) does not explicitly authorize courts to dismiss cases filed in bad faith, case law overwhelmingly supports the bankruptcy court's power to do so. *In re Karum Group, Inc.*, 66 B.R. 436, 15 B.C.D. 152 (Bankr.W.D.Wash.1986); *In re Mildevco, Inc.*, 40 B.R. 191 (Bankr.S.D.Fla. 1984); *In re Victory Constr. Co.*, 9 B.R. 549, 7 B.C.D. 257 (Bankr.C.D.Cal.1981); *In re The Bible Speaks*, 65 B.R. 415, 15 B.C.D. 1 (Bankr.D.Mass.1986); *In re Little Creek Development Co.*, 779 F.2d 1068 (5th Cir.1986) [cited with approval in the recent opinion of the Ninth Circuit Court of Appeals in *In re Arnold*, 806 F.2d 937 (9th Cir.1986)].

The *Little Creek* opinion cites ten indicia of a bad faith filing. Those relevant here include (1) the absence of employees except for the principals, (2) there is little or no cash flow and no available sources of income to sustain a plan of reorganization, (3) there are few, if any, unsecured creditors whose claims are relatively small, and (4) the debtor and one creditor may have proceeded to a standstill in state court litigation and the debtor has lost or has been required to post a bond which it cannot afford. Though four of the ten factors listed in the *Little Creek* opinion are present, the existence of bad faith depends not on the presence of any one specific

fact, but on an amalgam of factors after examination of the debtor's financial status and motives. *In re Arnold,* 806 F.2d 937 (9th Cir.1986).

As discussed above, debtor's filing had but one purpose—rejection of the SMI contract in order to avoid the attendant delays and expense of the state court specific performance action. It appears from the above-quoted declaration of SCSS' president that an equally important consideration in filing these proceedings was to insure that the "time, efforts, monies and energies expended *by the principals* of SCSS" would not have been in vain (emphasis added). Further evidence of the motivation for filing for relief is the passage from the same declaration at page two:

> The debtor believed after consultation with its attorney ... that 11 U.S.C. § 365(a) *et seq.,* provided the ideal methodology to accomplish a final and binding resolution for the concerned parties on both sides. The hearing on debtor's motion to reject the executory contract in question would be heard within a relatively short period of time following the filing of the petition as opposed to what promised to be a protracted state court matter if some action were taken in that form.

■ Debtor resists dismissal of its case as a bad faith filing and cites *In re Johns Manville Corp.,* 36 B.R. 727 (Bankr.S.D.N.Y.1984) in support of its position and argues that SCSS has met the threshold requirements of filing stated therein (i.e., a real company with a real debt and real creditors clamoring to enforce this real debt). As discussed above, in contrast to the Johns Manville Corporation, SCSS is currently a non-operational entity. Given the absence of creditor participation (other than SMI) this Court is hard pressed to find "real creditors clamoring to enforce this real debt." Moreover, in *Johns Manville,* no evidence was presented by the Asbestos Committee in support of its motion to dismiss. (At 734). In the instant case, the Court has reviewed the declarations of

each of the principals of SCSS, each of the principals of SMI and other declarations in support of and opposition to the proposed action. Ample evidence is before the Court supporting the granting of this motion to dismiss.

■ Where the Court becomes convinced that the true purpose of filing a petition is other than to reorganize a financially distressed business, but to merely take advantage of one of the remedies available under the Code, dismissal is appropriate in order to protect the jurisdictional integrity of the Court. *In re Alison Corp.,* 9 B.R. 827, 7 B.C.D. 500 (Bankr.S.D.Cal.1981); *In re Talladega Steaks, Inc.,* 50 B.R. 42 (Bankr.N.D.Ala.1985); *In re The Bible Speaks, supra.* Accordingly, the motion to dismiss is granted.

### III

### SANCTIONS

■ SMI has requested payment of its attorneys' fees and expenses incurred as sanctions against debtor and its counsel pursuant to Bankruptcy Rule 9011. Bankruptcy Rule 9011 provides in pertinent part:

> The signature of an attorney or a party constitutes a certificate by him that he has read the document; that to the best of his knowledge, information, and belief, formed after reasonable inquiry, it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harrass, to cause delay, or to increase the cost of litigation. If a document is signed in violation of this rule, the court on motion or its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the doc-

ument, including a reasonable attorney's fee.

Although the Court has determined that dismissal of this case pursuant to 11 U.S.C. § 1112(b) is appropriate, that does not and should not automatically result in the imposition of sanctions under Bankruptcy Rule 9011. The standards for dismissing a case under § 1112(b) are different from the standards used to impose sanctions under Bankruptcy Rule 9011. Such a *per se* rule for the imposition of sanctions is inappropriate, particularly in an area of bankruptcy practice which is rapidly developing (i.e., bad faith filings).[2]

Given the case authority which permits rejection of personal service contracts, even though such rejection is the sole motivation for filing a petition under the Bankruptcy Code, the Court cannot conclude that debtor's petition was filed without a good faith belief on the part of debtor's counsel that it represented an extension of existing law. *In re Noonan,* 17 B.R. 793, 8 B.C.D. 919 (Bankr.S.D.N.Y.1982); *In re Bofill,* 25 B.R. 550, 9 B.C.D. 1371, 1372 (Bankr.S.D.N.Y.1982); *In re Carrere,* 64 B.R. 156, 14 B.C.D. 977 (Bankr.C.D.Cal. 1986).

SMI's reliance on the decision in *In re Wavelength,* 61 B.R. 614 (9th Cir. BAP 1986) is misplaced, in that *Wavelength* involved the imposition of sanctions and punitive damages under 11 U.S.C. § 303(i) for bad faith filing of an involuntary petition by one whose conduct the Bankruptcy Court found to be "outrageous". Finally, the imposition of sanctions on debtor and debtor's counsel in this case would not further the policies behind Bankruptcy Rule 9011. Accordingly, SMI's motion for sanctions is denied.

Counsel for SMI is directed to prepare an order in conformance with this Memorandum Decision within ten (10) days from the date hereof.

---

2. The appellation "bad faith filing" is perhaps a misnomer in that it implies the existence of ill will or malicious conduct on the part of debtor prior to filing for relief. In most instances, as here, the filing will have been for a purpose other than that sanctioned by the Bankruptcy Code.