**In re Tionne WATKINS (T'Boz), Lisa Lopes (Left Eye), Rozonda Thomas (Chilli), Debtors.**

**Bankruptcy Nos. A95–69127–SWC thru A95–69129–SWC.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

April 11, 1997.

David G. Bisbee, Bisbee, Rickertsen & Herzog, Atlanta, GA, for Debtors.

Keith W. Berglund, William B. Hill, David Steinberg, Paul, Hastings, Janofsky & Walker, Atlanta, GA, for LaFace Records.

E. Penn Nicholson, Wendy L. Hagenau, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, for Peppitone and Reid.

*ORDER*

STACEY W. COTTON, Chief Judge.

Before the court are movant LaFace Records' ("LaFace") Motion to Dismiss or Abstain, and movant Pebbitone, Inc. and Perri Reid d/b/a Pebbitone Music's (collectively, "Pebbitone") Motion to Dismiss. LaFace and Pebbitone (collectively, "Movants") con-

tend that Tionne Watkins ("Watkins"), Lisa Lopes ("Lopes"), and Rozonda Thomas ("Thomas") (collectively, "Debtors") filed their respective Chapter 11 petitions in bad faith. Each Debtor has filed an individual Chapter 11 case.[1] These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A). Upon review of the authorities and evidence presented, the court finds and concludes the following.

### FACTS

The court adopts the stipulation of facts set forth in the parties' joint pre-trial order and incorporates it by reference. Debtors Watkins and Lopes signed a Production Agreement with Pebbitone dated February 28, 1991. At or about the same time, they entered into an Exclusive Songwriter's Agreement and a Co–Publishing Agreement (collectively, "Songwriting Agreement") with Pebbitone Music. The Production and Songwriting Agreements were amended on April 2, 1991, to reflect the addition of Debtor Thomas. (Joint Stipulation of Facts at ¶ 13(B)). Debtors and Movant Perri Reid also entered into a Management Agreement. On May 10, 1991, Movant Pebbitone Inc. and LaFace entered into a Recording Agreement granting LaFace exclusive rights to distribute Debtors' recordings and use the name "TLC" in the sale, promotion or exploitation of such recordings. (Joint Stipulation of Facts at ¶ 13(D)). Thereafter, Debtors signed an undated Inducement Letter with LaFace guarantying delivery of up to seven (7) albums should Pebbitone fail to deliver them under certain circumstances. (Joint Stipulation of Facts at ¶ 13(D)). Pursuant to those agreements, Debtors began recording and performing under the group name "TLC" and have enjoyed tremendous success.

In the ensuing years, tension and disagreements developed between Debtors and Pebbitone. Debtors terminated their management relationship with Perri Reid and employed Hiriam Hicks as their personal manager in 1993. (Joint Stipulation of Facts at ¶ 13(Y)) Debtors also employed entertainment counsel, Stephen Barnes ("Barnes"), to renegotiate the contract or a buy-out of the Pebbitone Production Agreement. (Joint Stipulation of Facts at ¶ 13(AA)). Apparently those efforts continued until they reached an impasse in May 1995.

At that time, Pebbitone granted LaFace the right to negotiate directly with Debtors subject to its approval.[2] (Joint Stipulation of Facts at ¶ 13(BB)). LaFace commenced negotiations with Debtors, through counsel, but made little progress. On or about June 15, 1995, Debtors' counsel advised LaFace for the first time that Debtors were contemplating the filing of bankruptcy petitions. Barnes also indicated that Debtors would seek to reject their contracts with Movant. (Tr. at p. 36). At the request of LaFace, the case filings were delayed for a short period; however, on July 3, 1995, Debtors filed their respective Chapter 11 cases.

During the period immediately preceding the filing, several conversations occurred between Barnes and representatives of LaFace and Pebbitone. On June 28 and June 30, letters were exchanged between Clifford Lovette ("Lovette") of LaFace, Pebbitone's attorney, Kenneth Kraus ("Kraus"), and Barnes. These letters reflect a growing tension between the parties that appears to have arisen, in part, from the disclosure of Debtors' contemplated case filings. No similar correspondence occurred prior to the Debtors' disclosures.

Prior to and during negotiations, Debtors were experiencing financial problems. They found it necessary to obtain loans from LaFace in March 1995 as follows: Watkins—$88,815.41; Lopes—$147,291.45; Thomas—$113,815.40. These loans are evidenced by demand promissory notes. If not paid on demand, the notes are payable from Debtors' royalties. (Debtors' Trial Exhibits "27–29"). The LaFace loan proceeds were used to catch up on delinquent bills and arrearage

---

**1.** Debtors' motions for joint administration were granted by order of the court entered August 2, 1995. The cases have not been substantively consolidated.

**2.** There is no evidence that Pebbitone has ever withdrawn or terminated this authorization for direct negotiation.

payments. (Tr. at p. 263—Lopes; Tr. at p. 326—Watkins). For example:

The undisputed testimony of Debtors and their accountant, Bruce Kolbrenner ("Kolbrenner"), establishes that each Debtor was behind on car payments, house payments, credit cards payments, automobile insurance payments, or other similar liabilities. (Tr. at pp. 261, 263—Lopes; Tr. at pp. 299–302—Thomas; Tr. at pp. 325–327—Watkins; Tr. at p. 356—Kolbrenner). Each testified that their financial problems had begun as early as 1994. They were continually confronted with difficulties in meeting monthly payments and were constantly behind in paying their debts. On several accounts, Debtors were delinquent in excess of three months. (Depo. testimony of Lisa M. Williams at pp. 35–37).

Prior to July 3, 1995, Debtors received six Pebbitone royalty statements for the period commencing in 1991 and ending December 31, 1994. The December 31, 1994 statement was the latest received prior to commencement of Debtors' cases. It reflects a negative balance of $576,828.98. This statement was amended post-petition to increase the negative balance to $827,695.12. (Joint Stipulation of Facts at ¶ 13(N); Debtors' Exhibit "16").

While LaFace conveyed to Barnes a willingness to make further funding advances to assist Debtors with regard to their financial problems, no amount was specified. (Joint Stipulation of Facts at § 13(DD)). Nevertheless, each debtor concluded that she needed to file a Chapter 11 case.

### DISCUSSION

The issue before the court is whether Debtors' petitions were filed in good faith. This issue has been considered on several occasions by the Eleventh Circuit. *See, In re Dixie Broadcasting, Inc.,* 871 F.2d 1023 (11th Cir.1989), *cert. denied, Dixie Broadcasting, Inc. v. Radio WBHP, Inc.,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *In re Waldron,* 785 F.2d 936 (11th Cir.1986), *cert. dismissed sub nom., Waldron v. Shell Oil Co.,* 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986); and *In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984). In

*Albany Partners,* the Eleventh Circuit instructs that:

Although "good faith" is required for confirmation of a reorganization plan, 11 U.S.C. § 1129(a)(3), Chapter 11 does not expressly condition the right to file or maintain a proceeding on the "good faith" of the debtor when the proceeding is initiated. However, § 1112(b) of the Code permits a bankruptcy court to convert or dismiss a case for "cause". The provision lists nine examples of cause, but the list is not exhaustive. The pertinent legislative history states, "The court will be able to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases." H.R.Rep. No. 595, 95 Cong., 1st Sess. 406 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6362. Accordingly, the determination of cause under § 1112(b) is "subject to judicial discretion under the circumstances of each case." *In the Matter of Nancant,* 8 B.R. 1005, 1006 (Bankr. D.Mass.1981). The equitable nature of this determination supports the construction that a debtor's lack of "good faith" may constitute cause for dismissal of a petition.

749 F.2d at 674.

In *Waldron,* it posited:

"The Bankruptcy laws are intended as a shield, not as a sword." *In re Penn Central Transportation Co.,* 458 F.Supp. 1346, 1356 (E.D.Pa.1978). Congress could not have intended that the debt free financially secure [debtors] be permitted to engage the bankruptcy machinery solely to avoid an enforceable contract.

785 F.2d at 940. Other courts have held that the court should not permit rejection or avoidance of contracts simply because a better offer has become available. *See, Matter of Northwest Place Ltd.,* 73 B.R. 978 (Bankr. N.D.Ga.1987) (Kahn, J.), *aff'd, In re Northwest Place Ltd.,* 108 B.R. 809 (N.D.Ga.1988); *In re Southern California Sound Systems, Inc.,* 69 B.R. 893 (Bankr.S.D.Cal.1987); *In re Carrere,* 64 B.R. 156 (Bankr.C.D.Cal.1986).

Further, in *In re Dixie Broadcasting, Inc.,* the Eleventh Circuit held that "[a]lthough

there is no precise test for determining bad faith, courts have recognized factors which show 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" 871 F.2d at 1027, (citations omitted). In considering the question of bad faith, courts have noted a number of factors that may be indicia of bad faith. *See, e.g., In re Dixie Broadcasting, Inc.*, 871 F.2d at 1027; *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988); *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir.1987); *In re Davidoff*, 185 B.R. 631, 635–636 (Bankr.S.D.Fla.1995); *Matter of Northwest Place Ltd.*, 73 B.R. at 981. The court will only consider those factors that have been raised or that the court deems applicable in these cases.

Movants argue that Debtors' petitions were not filed in good faith. They assert that Debtors are not financially distressed and experienced no serious creditor pressure prior to their case filings; that Debtors misled the court by failing to schedule certain assets, by scheduling inaccurate values, and by overstating their liabilities; that Debtors failed to adjust their extravagant lifestyles post-petition and continued to make payments to insiders; that Debtors engaged in certain post-petition actions which indicate bad faith; and that the true impetus behind Debtors' case filings is their desire to reject Movants' contracts.

### 1. *Whether Debtors Were Financially Distressed.*

■ Movants assert that creditors holding the greater dollar amount of each Debtor's indebtedness had made no demands for payment. It is undisputed that Debtors' largest obligations are held by LaFace, Pebbitone or industry professionals, i.e. advisors, managers and agents. None of these creditors were pressuring Debtors for payment. However, the negative royalty balance due Pebbitone is payable only from royalties. LaFace's indebtedness is evidenced by demand notes which, if not paid when due, are also recoverable from Debtors' royalties. All such royalties flow directly through the hands of Movants, LaFace and Pebbitone. Thus, there was no need for Movants to pressure Debtors. They controlled the

source and payment of Debtors' royalties. Similarly, the professionals, advisors and managers were so intricately involved or related to the music industry and the management of Debtors' business and financial affairs that they too had no real need to press for payment.

The undisputed testimony of Debtors and their accountant establishes that each Debtor was experiencing difficulty in making automobile payments, house payments, credit card payments, automobile insurance payments, or other similar liabilities. (Tr. at pp. 261–263—Lopes; Tr. at pp. 299–302—Thomas; Tr. at pp 325–327—Watkins; Tr. at p. 356—Kolbrenner). Each Debtor scheduled one or more automobile finance or lease creditors, a real property mortgage creditor and utilities, credit card and telephone creditors. Ms. Lopes and Ms. Watkins also scheduled medical obligations. (Debtors' Trial Exhibits "31–33"). These creditors comprise the majority in number, but a minority in total amount of indebtedness. Beginning as early as 1994, Debtors were consistently behind or experiencing financial difficulty in meeting their monthly obligations. On some of their accounts, Debtors experienced delinquencies of three or more months. (Depo. testimony of Lisa M. Williams at pp. 35–37). In fact, when loans were obtained from LaFace, the proceeds were used to catch up delinquent bills and arrearage payments. (Tr. at p. 263—Lopes; Tr. at p. 326—Watkins).

Ms. Watkins used the LaFace loan proceeds to purchase an automobile and to prepay her rent for one year because she was concerned about a place to live and the uncertainty of having sufficient funds to pay her monthly rental payments. (Tr. at p. 326). She also had one suit pending. (Joint Stipulation of Facts ¶¶ 13(Q) and 13(R)).

Ms. Thomas was being pressed by credit card companies demanding payment. She also faced uncertainty regarding her ability to pay bills from month-to-month. (Tr. at p. 299). Her schedules reflect that at least one of her accounts was in the hands of a collection agency. When asked how Debtors came to the decision to file for relief, she stated that "[we pulled] out our pockets with noth-

ing in them. That is exactly how we decided. None of us could pay our bills." (Tr. at p. 316).

Ms. Lopes testified that her delinquent payment history resulted in additional creditor pressure as future payments became due. (Tr. at p. 263). She expressed great concern over her inability to pay her bills. She appeared convinced that relief in this court was necessary because she didn't have money in the past and "had financial trouble for about ... two years." (Tr. at pp. 265, 269). Further, she was facing foreclosure on the Diamond Circle property, and she had been sued by two other creditors. (Movant's Trial Exhibit "2B"; Joint Stipulation of Facts ¶¶ 13(Q) and 13(R)). Thus, each Debtor credibly testified that she was receiving regular and consistent pressure from creditors.

It was, therefore, the non-industry and non-professional creditors who were pressing Debtors for payment. By their very nature, these obligations represented debts which most affected each Debtor's daily life. The fact that Movants and industry professionals had no need to press for payment does not negate the existence of pressure from other creditors. The court finds that each Debtor was, in fact, experiencing *bona fide* financial distress and creditor pressure that warranted Chapter 11 relief.

### 2. *Debtors' Solvency.*

■ There is no insolvency requirement for a Title 11 case. As stated in a leading bankruptcy treatise:

> It is worth noting that a chapter 7 "debtor" need not be insolvent to be eligible for chapter 7 relief. Nor does the standard established for those persons who "may be" a debtor under chapter 7 contain any specific or implied requirement that such persons be heavily burdened by debts. Under this subdivision any person not within the excluded class who owes debts in any amount, no matter how small, may file a petition for liquidation.

L. King, *2 Collier on Bankruptcy* § 109.02 at 109–11 (15th ed.1996). With a few nonrele-

vant exceptions, a person eligible for relief under Chapter 7 is eligible for relief under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 109(d).

Further, creditors filing an involuntary petition need only show that a debtor is not paying such person's debts as they become due. 11 U.S.C. § 303(h)(1).[3] In the court's view, Congress has not imposed a greater burden upon a voluntary debtor than an involuntary debtor. Although a debtor's assets may exceed liabilities, the debtor's income or cash flow may be insufficient to pay those debts as they become due. Such debtor is, nevertheless, financially distressed because of the inability to pay. The court finds that each of these Debtors was unable to pay her debts as they matured. Further, based upon their known financial circumstances, Debtors believed themselves to be insolvent.

The evidence indicates that two debtors, Ms. Thomas and Ms. Watkins, may have become solvent post-petition. This results from the post-petition accrual of royalties sufficient to satisfy Pebbitone's negative royalty balance and a surplus of $1,800,000 or $600,000 due each Debtor. As for Ms. Lopes, the issue is somewhat more doubtful due to the $1,300,000 damage claim of Lloyds of London. While this claim is disputed, the court cannot simply ignore its existence since it may be resolved adversely to Ms. Lopes. *In re Chi–Feng Huang*, 23 B.R. 798 (9th Cir.BAP 1982).

■ In determining whether to file Chapter 11 cases, Debtors were reasonably entitled to rely upon the latest financial information available to them at the time. That information indicated a negative royalty balance in excess of $576,000. (Tr. at p. 53; Debtors' Trial Exhibit "16"). The possible post-petition solvency of Debtors Thomas and Watkins does not establish, however, that they were able to pay their debts when due at the time their cases were filed. In fact, the evidence shows that each of these Debtors was unable to do so. Therefore, Debtors are not precluded from invoking the protection provided by the Bankruptcy Code.

---

**3.** Section 303(h)(1) provides ... [T]he court shall order relief ... only if—

    (1) the debtor is generally not paying such debtor's debts as such debts become due ...;

Movants also contend that the court should consider Debtors' ancillary income prospects in determining Debtors' solvency. First, this so-called "ancillary income" is prospective only. It is speculative at best. Further, Movants' expert, Lance Grode ("Grode"), acknowledged that he had not based his opinions on the historical experience of these Debtors. (Tr. at pp. 174–175). In the final analysis, the market place is the best determinant of Debtors, ability to earn income. In fact, Debtors have not earned ancillary income approximating Grode's projections. Even if they can, that does not change each Debtor's financial condition at the time her case was filed. It would support their prospects for reorganization. Finally, Grode's testimony is of doubtful probative value as he acknowledged that some of the amounts stated were not his, but were provided by other persons who were not before the court. (Tr. at pp. 176, 179–180).

### 3. *Whether Debtors Disguised Their Financial Condition.*

Movants point to the failure to schedule certain assets and values. They contend that Ms. Lopes failed to schedule Left–Eye Productions, Left–Eye Management and Left–Eye Music, and that all three Debtors failed to schedule the group name "TLC," PYT Inc., the "MTV" contract and the "Waiting to Exhale" soundtrack contract. Without a doubt, a full and fair disclosure requires scheduling these assets. The question, however, is whether the omissions were willful and intended to mislead creditors and the court.

■ In paragraph 16(a) of Ms. Lopes "Statement of Financial Affairs," she listed both Left Eye Productions and Left Eye Management, Inc. (Movant's Trial Exhibit "2B"). She testified that she did not list the Left–Eye entities in Schedule "B"—Personal Property—because they had no significant value in her judgment. In fact the Left–Eye entities share office space with The Howard Agency, which provides the office furnishings, a copier, fax machine and computer equipment for use by Left–Eye. (Tr. pp. 84–86, 120). Testimony elicited not one example of a successful artist being managed or produced by Left–Eye. The court, therefore, is satisfied that the Left–Eye entities were disclosed, although not listed in Schedule "B". The court finds Ms. Lopes' testimony to be credible and is satisfied that her failure to list the Left–Eye entities in Schedule "B" was not an effort to disguise her financial condition, but was based on her belief that they had no significant value.

Debtors credibly testified that PYT Inc. is their new touring company which has not yet engaged in business and has no value. This appears to be based largely on the fact that their last tour lost about $300,000. (Tr. at p. 84). They further testified that Suki–Suki was their old touring company. It is no longer in business having lost a substantial amount of money on their last tour. Tiz Biz is their publishing company which was scheduled with an "unknown" value. There is no evidence to establish that it was incorrectly scheduled. (Tr. at pp. 84–93, 130–132, 217–220). Although certain post-petition deposits were made into the Tiz Biz account, each Debtor denied knowledge of them. No evidence was presented to refute Debtors' asserted values on July 3, 1995. Acknowledging that it should have value, they testified credibly that they don't know what it should be. Based upon this unrefuted testimony, the court is satisfied that these omissions were the result of Debtors' good faith belief that they had no value. The evidence does not establish that the omissions were for the purpose of misleading the court and creditors. Further, there is adequate means within the Bankruptcy Code to deal with willful omissions and misstatements. The harsh sanction of dismissal is not warranted.

■ With regard to the "MTV" contract, it appears that each Debtor was paid $10,000 prepetition in return for executing a letter extension of a contingent option or exclusivity agreement for possible future personal services. (Movants' Trial Exhibit "16"). The May 4, 1994 agreement referred to in the letter extension is not in evidence. The evidence does not establish any value for this agreement beyond the $10,000 prepetition payment to each Debtor. Presumably, terms, conditions and benefits would have been negotiated at such time as MTV "obtained a pilot order." While it should have

been scheduled, at least as an executory personal service option, it does not appear to be a material omission. As for the "Waiting to Exhale" contract, it bears a post-petition date on its face and was apparently negotiated by or through LaFace. (Movant' Trial Exhibit "63"; Joint Stipulation of Facts at ¶ 13 Q(KK)). Since it was executed post-petition, there is no requirement that it be scheduled, even if based upon pre-petition negotiations. The court finds and concludes that Debtors' failures to schedule the "MTV" and "Waiting to Exhale" contracts are not material omissions made in bad faith to disguise their financial condition or to mislead the court and creditors.

Next, it is undisputed that the name "TLC" is owned by Pebbitone. Debtors testified that they did not list the name "TLC" for that reason. The court finds this testimony to be credible. The owner of the name (Pebbitone) and licensee (LaFace) are scheduled. Further, the existence and use of the name "TLC" by Debtors is openly and popularly known. Both Movants are inextricably involved with the group name. Common sense suggests that Debtors' group popularity as "TLC" and the scheduling of the Pebbitone and LaFace executory contracts was sufficient disclosure to enable creditors to ascertain the existence and use of the group name. The omission simply does not appear to be an attempt to disguise Debtors' financial conditions.

█ Finally, Movants contend that Debtors overstated their liabilities. First, Debtors acknowledged that they each scheduled the Internal Revenue Service ("IRS") as priority unsecured claims as follows: Lopes— $59,057, Thomas—$52,667 and Watkins— $47,227. (Tr. at pp. 93, 133, 221). These amounts were scheduled as "estimated" taxes. Debtors' accountant testified that these figures were incorrectly calculated because he included the loan proceeds from LaFace as income on Debtors' tax returns. (Tr. at pp. 365–366). There is no evidence to support a finding that Debtors knew or should have known of such errors when their cases were filed.

█ Movant also assert that Pebbitone's negative royalty balance is not an indebted-

ness and that each Debtor is responsible for only one-third of the total. Debtors each scheduled unrecouped royalties of $566,-434.48. All agree that Pebbitone's December 31, 1994 statement actually reflects $576,-828.98. Further, it was amended post-petition to increase the amount to approximately $827,000 (Debtors' Trial Exhibit "16").

Paragraph twenty-one (21) of the Production Agreement states "[a]ll of the terms, conditions, warranties, representations, *and obligations* applicable to the Artist contained in this contract *shall apply jointly and severally to each individual member of the Artist.*" (Defendants' Trial Exhibit "1"; Movant' Trial Exhibit "12" at ¶ 21) (emphasis added). Each Debtor properly scheduled the entire claim amount because of their joint and several liability for the repayment from their royalties.

The Supreme Court in *Johnson v. Home State Bank (In re Johnson)*, 501 U.S. 78, 85, 111 S.Ct. 2150, 2155, 115 L.Ed.2d 66 (1991) held that " § 102(2) establishes, as a '[r]ul[e] of construction' that the phrase 'claim against the debtor includes claim against property of the debtor.'" It concluded,

> ... insofar as Congress did not expressly limit § 102(2) to nonrecourse loans but rather chose general language broad enough to encompass such obligations, we understand Congress' intent to be that § 102(2) extend to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests come into existence.

*Id.* at 86–87, 111 S.Ct. at 2155–56. *See also, Matter of Hutcherson*, 186 B.R. 546 (Bankr. N.D.Ga.1995) (Drake, J.).

When Debtors' cases commenced, Pebbitone's latest statement showed, and Debtors believed themselves to have, an approximate $576,000 negative royalty balance. This balance is payable only from Debtors' future royalties. Thus, Pebbitone held a claim against each Debtor's property or right to property. The court concludes, therefore, that each Debtor properly listed the Pebbitone claim. Debtors did not omit assets and values or overstate liabilities in an attempt to disguise their financial conditions.

#### 4. *No Lifestyle Adjustments By Debtors.*

■ Movants contend Debtors have made no adjustment in their lavish lifestyles. The cases cited by Movants are Chapter 7 cases under 11 U.S.C. § 707 involving substantial abuse. This provision applies only to Chapter 7 cases involving primarily consumer debt. 11 U.S.C. § 103(b). Therefore, the cases cited under § 707 are neither applicable nor persuasive with regard to the Chapter 11 good faith issue.

In every Chapter 11 case there is a presumption of some degree of financial mismanagement. Undoubtedly each Debtor leads a lavish lifestyle compared to most people. They acknowledge no real post-petition lifestyle adjustment. However, that result is due at least in part to the availability of post-petition, non-estate personal services earnings or because Movants have consented to Debtors use of funds. If the funds are property of the estate, Movants have consented to their use. If they are not property of the estate, Movants have not cited, and the court has not found, any authority that restricts Debtors' use of their non-estate or exempt property.

There is no evidence that estate funds have been misapplied. In fact, it appears Debtors have primarily used funds which they contend are from post-petition personal services. Neither the creditors nor the U.S. Trustee have contested the use of cash collateral or the fact that Debtors have generated and used proceeds from post-petition personal services. The court concludes that the failure of Debtors to alter their lifestyles post-petition does not establish bad faith in the filing of their cases.

#### 5. *Payment To Insiders.*

■ Payments to or for family members have been disclosed throughout Debtors' monthly reports. It is unclear whether the payments were made from post-petition personal service earnings or from cash collateral whose use was consented to by Movants. The care or support of family members is a serious matter which is not, *per se*, improper or undesirable. Supporting one's family or family members is a normal and desirable societal goal. The proper inquiry is whether the payments are a misuse of estate funds

and harmful to the estate and creditors. While questioning their propriety, Movants have presented no evidence to show that the insider payments were improper or detrimental to these estates. In fact, the court finds these post-petition actions to be of little or no relevance with regard to Debtors' prior determination to file these cases. The court finds that the post-petition payments to insiders do not support a finding that these cases were filed in bad faith and that they should be dismissed. If estate funds are being misapplied or improperly disbursed, there are adequate means available to deal with it without resorting to the drastic sanction of dismissal.

#### 6. *Failure To Seek Advances From LaFace.*

■ Movants further contend that the failure of Debtors to seek advances from LaFace constitutes bad faith. Debtors testified that they did not want to resort to further advances because they would merely get deeper in debt. (Tr. at pp. 288—Lopes & 349—Thomas) Their response is credible. Common sense tells us that debtors cannot borrow themselves out of debt.

#### 7. *Pre-petition Statements Regarding Case Filing and Intent To Reject Contracts.*

Movants contend that the sole purpose of these case filings is to reject their contracts for a better deal. They point to Barnes' statement to LaFace that Debtors would be filing bankruptcy petitions and would reject Movants' contracts. There was no showing that the statement was made under circumstances that suggest bad faith. The fact that a statement is made in the course of negotiations does not automatically make it a declaration in bad faith. While the parties had been negotiating in an effort to resolve their differences, these cases were not filed until they reached an impasse. Even then Debtors delayed filing for a short period at the request of LaFace. Having considered the demeanor of the witnesses and the circumstances surrounding the statement, the court is satisfied that this was merely a statement of intention by Debtors' counsel.

### 8. *Debtors' Post-petition Conduct.*

Movants also point to certain post-petition conduct as an indication of bad faith. First, they point to the failure of Ms. Watkins and Ms. Thomas to attend the first scheduled § 341 meeting. In fact, all three Debtors attended a rescheduled § 341 meeting. While the court does not condone the failure to attend a regularly scheduled § 341 meeting, the failure to do so does not establish that the petitions were filed in bad faith. Dismissal for failure to appear, particularly when they subsequently appeared, is too drastic a sanction for the offense.

Next, Movants point to the attempt by Ms. Watkins to purchase a home for which she made a deposit of $80,000 and requested court authorization to borrow in excess of $200,000 to complete the purchase. When Movant objected to that request, the motion was withdrawn. This is clearly unusual. However, Ms. Watkins' monthly financial report indicates that LaFace provided the funds to make the $80,000 deposit. A simple objection would have prevented such use. Further, it has been asserted that these funds were earnings from post-petition personal services and were not property of the estate. If true, Ms. Watkins was free to use those funds in her discretion. The evidence does not establish this to be an improper disbursement. Movants have not shown Ms. Watkins' actions to be in bad faith and the sanction of dismissal is not warranted. This is particularly true since one of the Movants actively consented to the transaction.

### 9. *Were Petitions Filed Merely To Reject Unprofitable Contracts.*

Finally, Movants contend that Debtors' cases were filed solely to reject certain contracts between the parties. This court agrees that where the *sole* objective of a solvent debtor is to reject a contract in favor of a better one, the petition is in bad faith as it serves no useful reorganization purpose. *In re Waldron*, 785 F.2d at 940–941. However, the evidence does not support Movants' position. While Debtors did move to reject Movants' contracts shortly after filing, this fact alone does not establish

bad faith. The real question is whether Debtors were experiencing *bona fide* financial problems that warranted bankruptcy relief. For the reasons set forth herein, the court finds and concludes that they were.

### 10. *Likelihood of Reorganization.*

It appears likely that Debtors can propose reorganization plans within a reasonable time. The evidence establishes that Debtors have earned post-petition royalties under their present contacts sufficient to pay the $827,000 negative royalty balance to Pebbitone plus $600,000 net to each Debtor. Lovette testified that LaFace had offered to renegotiate the contracts with Debtors with an estimated gross value to Debtors of $16,-000,000. Further, Debtors' income prospects may increase substantially if they reject Movants' contracts. For these reasons, the court concludes there is a reasonable likelihood that Debtors can propose reorganization plans within a reasonable time. Accordingly, the motions to dismiss will be denied.

For the reasons set forth herein, the court also concludes that abstention is not appropriate in this case as resolution of the issues is in the best interest of Debtors and their creditors. Accordingly, it is

**ORDERED** that Movants', LaFace and Pebbitone, Motions to Dismiss are **denied**, and it is

**FURTHER ORDERED** that Movant's, LaFace Motion to Abstain is also **denied**.

The clerk is directed to serve a copy of this order upon Debtors, Debtors' counsel, counsel for Pebbitone, Inc. and Perri Reed, counsel for LaFace Records, and the United States Trustee.

IT IS SO ORDERED.